THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALVIN L. YOUNG, Defendant-Appellant.

Second District   No. 2—04—0222

Opinion filed December 22, 2005.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Margaret M. Healy, of Woodridge, for the People.

JUSTICE GROMETER delivered the opinion of the court:

Defendant, Alvin L. Young, appeals from his convictions of two counts of domestic battery (720 ILCS 5/12—3.2(a)(1), (a)(2) (West 2002)). He contends that the State failed to prove an element of that offense, that the victim was a "family or household member" (720 ILCS 5/12—3.2(a)(1), (a)(2) (West 2002)) and that the dual convictions violate the one-act, one-crime rule because the State did not try to prove two separate acts of battery. We agree with defendant and therefore vacate one of the convictions and reduce the remaining conviction to one for the lesser included offense of battery (720 ILCS 5/12—3(a)(1) (West 2002)). Further, defendant contends that he is entitled to a $5 a-day credit against his fines for presentencing incarceration. However, because the fines were not proper, we vacate them, so that no fines exist against which we could credit the $5 a day.

## I. BACKGROUND

The State brought a misdemeanor complaint against defendant, charging him with two counts of domestic battery and one count of

criminal damage to property (720 ILCS 5/21—1(1)(a) (West 2002)). The first domestic battery count alleged that defendant "[k]nowingly and without legal justification, made physical contact of a provoking nature with Carol S. Henningson, girlfriend of said defendant, in that said defendant grabbed Carol S. Henningson by her hair and pushed her to the ground, bit her bottom lip twice, and back handed her twice across her left cheek." The second domestic battery count alleged that defendant "knowingly and without legal justification, caused bodily harm to Carol S. Henningson, girlfriend of the defendant, in that said defendant grabbed Carol S. Henningson by her hair and pushed her to the ground causing her right knee to get scraped. Defendant also bit Carol S. Henningson's bottom lip causing a mark." The complaint alleged that this incident occurred at 6:55 p.m. on December 7, 2003 (a Sunday).

At defendant's bench trial, Henningson testified that, on December 7, 2003, she was staying in a P.A.D.S.[1] shelter in a church. She had met defendant at the same shelter in mid-October. However, when the State asked her whether she had developed "a dating relationship" with defendant, she said "no." The State asked her if she had "some type of relationship with [defendant] on December 7th, 2003." Henningson replied in a way suggesting that the two had a social relationship, but had been on only one date: "Other than a social, you know, we went out for a beer and watched a football game at the Latern [sic] in downtown Naperville." The State then asked Henningson if she and defendant were both residents of "the PAD [sic] shelter" on December 7, 2003, and Henningson said that they were.

Henningson testified that she and defendant had spent that Saturday night together at a P.A.D.S. site in Clarendon Hills. They left early in the morning in Henningson's car, driving to Naperville so that the two could wash defendant's clothes at a Laundromat. In the early afternoon, the two went to a bar to watch a football game and have beers. When the game was over, they went to a liquor store and defendant bought a six-pack of beer. He also had a pint of a clear liquor. Defendant drove Henningson's car to an area behind a band shell in Naperville. They stayed there until Henningson thought it was time to leave for the shelter.

They parked in a lot across from the shelter. Defendant started being "argumentative." Henningson said they should go in because people were starting to line up and she did not want to arrive after the shelter was full. Defendant told her that he wanted to stay in the

---

[1]As best we can determine, this stands for Public Action to Deliver Shelter, Inc.

car to sleep, but she said that she would not let him. She tried to grab the keys out of the ignition, and they struggled for the keys. He took the keys, then she got out of the car and opened the back door to get both of their possessions out. She grabbed the leftover beers out of the front seat and threw them in some bushes. She walked toward the bushes, and defendant knocked her to the ground, sat on her, and bit her lip while trying to kiss her. The bite left a small bruise. They continued arguing, and defendant slapped Henningson across the face with the back of his hand. The slap left a slight mark. When asked how this made her feel, Henningson reported that it hurt and made her feel like an idiot.

Henningson testified that, after defendant slapped her, she decided to cross to the shelter. While she had her back turned to her car, she heard a sound of breaking glass. She later discovered that one window in her car was broken. She called the police from a cell phone she borrowed from a couple near the shelter, and the police arrived in about three minutes.

Officer Dawn Yorke of the Naperville police testified that she responded to Henningson's call. She observed that Henningson had a scrape on her right forefinger, a scrape on her right knee, and a small abrasion on her lower lip. Henningson told Yorke that the scrape on her finger came from the struggle over the keys, the scrape on her knee was the result of her being pushed to the ground, and the abrasion on her lip was the result of a bite. Shortly after Yorke spoke to Henningson, the police found defendant and placed him under arrest.

Defendant moved for a directed finding, which the court granted as to the criminal damage to property count. The court found insufficient evidence to show that defendant had been the one who broke the car window. The State, while arguing against the motion, asserted that Henningson had testified that she was defendant's "roommate."

Defendant was the sole defense witness. His testimony was essentially consistent with Henningson's regarding the events before the two arrived in the parking lot across from the shelter. He did not specifically testify about the nature of the relationship between himself and Henningson. According to his testimony, the two arrived across from the shelter at about 5:30 p.m., an hour before admitting time. He did not want Henningson to go to the shelter when they arrived because, a month before, P.A.D.S. had denied him admission to all P.A.D.S. shelters for two weeks for the infraction of arriving with a vehicle at a no-vehicle shelter. During his suspension, he stayed in "the car," then P.A.D.S. readmitted him on probation. He believed that coming onto the P.A.D.S. site before 6:30 would break the terms of his probation and cause P.A.D.S. to deny him admission permanently.

He told Henningson that they would get into trouble if they went to the shelter too early, but she said she needed to use a bathroom and insisted on going. Defendant commented that "she don't listen when she drinks."

Defendant testified that Henningson got out of the car to enter the shelter, and he put his arms around her to stop her. Henningson struggled to get out of defendant's grip, and both fell to the ground. She butted him in the face, hitting her mouth on him. Under cross-examination, defendant volunteered that the head-butting occurred when he was trying to kiss her—which he said he was doing to calm her down.

The State, in its closing argument, noted that defendant's own testimony was nearly sufficient to prove the State's case:

> "Even if you believe only the defendant's testimony, I would submit to you that you must find the defendant guilty because we only have to show that the physical contact of an assaulting [sic] or provoking nature was made. *** And we've also shown that an injury occurred based on physical confrontation that happened with the biting of the lip which then resulted in the injury on the lip."

The court found defendant guilty on both counts and sentenced him to 90 days in jail, with credit for 66 days served, a $100 domestic violence fine, and a $10 domestic battery fine. Defendant filed a post-trial motion in which he asked for a new trial based on the State's failure to prove his guilt beyond a reasonable doubt and two assertedly improper evidentiary rulings by the court. The court denied the motion, and defendant timely appealed.

## II. ANALYSIS

On appeal, defendant asserts (1) that the State failed to prove beyond a reasonable doubt that defendant and Henningson's relationship brought him within the scope of the domestic battery provision; (2) that his convictions of two counts of domestic battery violate the one-act, one-crime rule because the State did not try to prove two separate acts of battery; and (3) that defendant is entitled to a $5 dollar-a-day credit against his fines for time he spent in jail before sentencing. We agree with the first two contentions, and, with regard to the third, hold that, because the fines were improper, calculation of a credit is unnecessary. We consider each contention in turn.

### A. The Scope of the Phrase "Family or Household Member" in the Domestic Battery Provision

First, we agree with defendant that the State failed to prove that he and Henningson were "family or household members" as required

for a domestic battery conviction. We will not reverse a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When a defendant challenges the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). Therefore, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

■ One element of the offense of domestic battery is that the accused and the victim must be "family or household member[s] as defined in subsection (3) of Section 112A—3 of the Code of Criminal Procedure of 1963 [(725 ILCS 5/112A—3(3) (West 2002))]." 720 ILCS 5/12—3.2(a)(1), (a)(2) (West 2002). Section 112A—3 specifies:

> " 'Family or household members' include *** persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, *** [and] persons who have or have had a dating or engagement relationship ***. For purposes of this paragraph, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." 725 ILCS 5/112A—3(3) (West 2002).

The State has presented two theories as to how the relationship between Henningson and defendant fell within this definition. First, at trial (after Henningson denied having a "dating relationship" with defendant), the State asserted that Henningson was defendant's "roommate," thus suggesting that she qualified as a member of defendant's household because they lived together. Second, on appeal, the State argues that the evidence showed that Henningson and defendant had an intimate relationship and that the court could therefore conclude that they had a "dating relationship." We hold that the evidence presented was insufficient under either theory.

■ We turn first to the State's claim that defendant and Henningson fell within the definition of "family or household members" because they lived together. Henningson's testimony that she and defendant stayed in the same shelter the night before the offense and

the implication in her testimony and defendant's that the two had chosen to stay in the same shelter on other nights were insufficient to prove that the two were members of the same household. As we will explain, shared lodgings are not a shared dwelling unless the living arrangement has a degree of permanence. Further, two people do not become a household by virtue of lodging together unless that lodging together is an established mode of living.

At trial, the State implicated that Henningson and defendant shared a common dwelling because they spent a night together in the same shelter. We reject the implication that persons who have shared lodgings necessarily have shared a common dwelling. We need not decide whether we agree with defendant's contention that the P.A.D.S. shelter at which he and Henningson both spent a night was, by its nature, too much a place of transitory lodging to be *anyone's* dwelling. Instead, we hold that the evidence fails to establish that it was ever *their* dwelling. In ordinary[2] and legal usage,[3] the word "dwelling" can mean any structure in which people live. However, if one says that a place is a person's dwelling, one will generally mean that he or she dwells there, that is, he or she lives or resides there. See Webster's Third New International Dictionary 706 (1993). It is not ordinary English usage to say that a person dwells, lives, or resides in a place unless he or she stays there on an extended, indefinite, or regular basis. Thus, for two people to "share a common dwelling" is for them to stay in one place together on an extended, indefinite, or regular basis. For example, a host and an ordinary houseguest do not share a common dwelling; the host dwells—lives—in the house, but the guest merely lodges—stays—there.[4]

Our conclusion that section 112A—3(3) does not extend to people

---

[2]A "dwelling" is a "building or construction used for residence," an "abode" or "habitation." Webster's Third New International Dictionary 706 (1993).

[3]For purposes of the residential burglary statute (720 ILCS 5/19—3 (West 2002)), a " 'dwelling' means a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside." 720 ILCS 5/2—6(b) (West 2002).

[4]We recognize that *Glater v. Fabianich*, 252 Ill. App. 3d 372, 375-76 (1993), provides some support for the proposition that two people can "share a common dwelling" if one stays briefly with the other, at least if they share household expenses. The portions of *Glater* that support this proposition are *dicta* and without supporting reasoning. To the extent *Glater* suggests that a transitory visit can be the basis for finding that two people share a common dwelling, we do not follow it.

who have merely shared accommodations is consistent with the purpose of the provisions of which it is a part, which is to address *domestic* violence. The General Assembly intended the domestic violence provisions to address the particular problems of abuse in intimate relationships (with some limitations we discuss later). *E.g., People v. Whitfield*, 147 Ill. App. 3d 675, 679 (1986). A transitory sharing of accommodations (particularly mass accommodations, as in a shelter) is not, by itself, a mark of an intimate relationship.

The evidence established that, the night before the incident, both defendant and Henningson stayed at the Clarendon Hills P.A.D.S. shelter, but nothing suggested that that particular shelter was a place the two regularly stayed together. In fact, at the time of the incident, defendant had just finished a period of exclusion from P.A.D.S. during which he had slept in a car. Further, on the night of the incident, the two intended to go to a shelter other than the one at which they had spent the previous night. Thus, the evidence did not establish any regularity in the places the two stayed, so evidence of any place that was ever a common dwelling for the two is lacking.

We do not exclude the possibility that two people could form a "household" for the purposes of section 112A—3(3) by virtue of their consistently lodging together. The language of the definition in section 112A—3(3) is not an exclusive list: the section states that " '[f]amily or household members' *include* *** persons who share or formerly shared a common dwelling." (Emphasis added.) 725 ILCS 5/112A—3(3) (West 2002). One could naturally view two people who do not have a fixed residence, but who nevertheless stay together as a cohesive unit, as a household, if a nomadic one. However, the evidence does not establish that defendant and Henningson formed such a household. Defendant and Henningson met less than three months before the incident, and no evidence exists to show when they first deliberately chose to stay in the same shelter or how consistently they stayed together.

■ The State also argues that the evidence of intimacy between defendant and Henningson was sufficient for the court to conclude that they were in a "dating relationship." We disagree. Although Illinois courts have described section 112A—3(3) as covering people in "intimate" relationships (*e.g., Whitfield*, 147 Ill. App. 3d at 679), the section has nothing in it to suggest an intention to bring *all* intimate relationships within its scope. (Note that in these cases, the courts have used the word "intimate" in a broad sense, not as a euphemism for "sexual.") Until 1993, the section encompassed only people who would fall within the ordinary understanding of former and current family and household members: " 'Family or household members'

includes spouses, former spouses, parents, children, stepchildren and other persons related by blood or marriage, persons who share or formerly shared a common dwelling, and persons who have or allegedly have a child in common." 725 ILCS 5/112A—3(3) (West 1992). Effective 1993, the General Assembly added to the definition "persons who have or have had a dating or engagement relationship, [and] persons with disabilities and their personal assistants." Pub. Act 87—1186, eff. January 1, 1993. These are two groups that one might not naturally include in a class with family or household members, but for which the problems of abuse are similar to those in more strictly domestic relationships. By broadening the definition this way, the General Assembly made it reach most intimate relationships. However, nothing about the change suggests that the General Assembly intended to bring *all* intimate relationships within its scope. The definition does not cover intimate friendships and intimate working relationships simply by virtue of their intimacy. Thus, it is not enough for the State to show that defendant and Henningson had an *intimate* relationship; it must show that they had a *dating* relationship or other relationship that falls within the definition. The State has not done that here.

This court has held that a " 'dating relationship' is a serious courtship," "a relationship that [is] more serious and intimate than casual." *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 653 (2003). In *Alison C.*, the petitioner and respondent went on only a single lunch date. We held that this contact did not amount to a "dating relationship." *Alison C.*, 343 Ill. App. 3d at 653. However, where, as here, the evidence suggests that the relationship was serious and intimate but its focus—friendly or romantic—is unclear, we need to consider what constitutes a "serious courtship." In defining a "dating relationship" as a "serious courtship" in *Alison C.*, we adopted the reasoning of a California appellate case, *Oriola v. Thaler*, 84 Cal. App. 4th 397, 412, 100 Cal. Rptr. 2d 822, 832 (2000), which looked to sociological studies to outline the practices of dating. *Oriola* used the term "courtship" in a broad sense: " 'the unattached flirt, the engaged college seniors, the eighth-grade "steadies," and the mismatched couple on a blind date are all engaged in courtship.' " *Oriola*, 84 Cal. App. 4th at 407, 100 Cal. Rptr. 2d at 829, quoting B. Bailey, *From Front Porch to Back Seat: Courtship in Twentieth-Century America*, at 6 (1988). The word "courtship," in this sense, encompasses most romantically oriented behavior outside marriage, whether or not the relationship is consummated. In this context a *"serious* courtship" is not limited to a relationship likely to lead to marriage. However, we think that it is clear that a "serious courtship" must be, at a minimum, an established relationship with a significant romantic focus.

The evidence to which the State points fails to show such a focus in the relationship between defendant and Henningson. The State notes elements in the testimony of the two that suggest intimacy in their relationship. The State suggests that Henningson and defendant had an established pattern of spending time together and that each felt familiar with the other's character. In addition, the evidence shows that Henningson accompanied defendant to the Laundromat. However, evidence of a romantic element in the relationship is scant, and none of it suggests that such elements were a significant focus. Direct evidence of romantically oriented behavior is limited to defendant's admission that he was trying to kiss Henningson after he knocked her down. The indirect evidence is limited to evidence that is equally compatible with a nonromantic friendship. Any inference that the parties' relationship had been consummated because they spent the night together is wholly negated by the fact that the place they spent the night was a homeless shelter. That Henningson chose the word "social" to describe the relationship is direct evidence that she did not think that it had a romantic focus. The most a reasonable person could conclude on this evidence is that the two had a pattern of companionship that may have included an element of romantic interest, at least on defendant's part. This evidence is wholly insufficient to support a finding that the two had a serious courtship, even in the broad sense we used that phrase in *Alison C*. Because the evidence is insufficient to support a finding that defendant and Henningson were family or household members, we reduce defendant's convictions to the lesser included offense of battery.

## B. One-Act, One-Crime Rule

■ Defendant contends that, under the rule in *People v. Crespo*, 203 Ill. 2d 335, 342-45 (2001), his dual convictions violate the one-act, one-crime rule because the State never tried to prove that he committed two separate batteries. We agree. Whether multiple convictions must be vacated under the one-act, one-crime doctrine is a question of law, which we review *de novo*. *Village of Sugar Grove v. Rich*, 347 Ill. App. 3d 689, 698 (2004). *Crespo* teaches that, for the State to properly obtain multiple convictions for connected acts that it might treat as a series of offenses, it must apportion the acts to the offenses in the charging instrument and at trial. Under the rule in *People v. King*, 66 Ill. 2d 551, 566 (1977), multiple convictions obtained for a series of closely related acts do not violate the one-act, one-crime rule unless some of those offenses are, by definition, lesser included offenses. However, in *Crespo*, the supreme court held that, for a series of closely related acts to count as multiple acts for purposes of supporting

multiple convictions, the State must prosecute the case on such a theory. *Crespo*, 203 Ill. 2d at 342-45. What the State *cannot* do is prosecute the case on the basis that multiple theories of culpability support a single offense, then, on appeal, argue that separate acts support multiple convictions. *Crespo*, 203 Ill. 2d at 342-45. We conclude that the State is making such an attempt to change the basis of its case in this appeal.

Here, the State never distinguished at trial or in the complaint between the conduct it deemed to be an insulting or provoking contact and that which it deemed to be a contact causing physical harm. Instead, every indication supports the idea that the State charged and prosecuted this matter under alternate theories of culpability to prove a single offense of battery. The allegation that defendant "back handed [Henningson] twice across her left cheek" is found only in one count of the complaint; every other alleged action is in both. Further, although the "backhanding" allegation appears only in the insulting or provoking battery count, nothing suggests that the State was singling out the backhanding as insulting or provoking as opposed to other acts that caused bodily harm. In fact, the State tried to show that the backhanding did cause bodily harm.

The State argues that defendant committed an insulting or provoking battery when he pushed Henningson to the ground and a battery that caused bodily harm when he bit her lip, but it fails to show that it ever separated the acts this way before this appeal. We deem its contention that its closing portrayed these acts as constituting separate offenses to be a *post hoc* attempt to recast its prosecution of the case to support the two convictions. In its closing, it simply described defendant's acts in sequence, and then asserted first that it had showed that the acts caused offense and second that they caused bodily harm. Nothing in the closing suggested that it intended to argue that the earlier act caused offense and the later acts caused bodily harm. Thus, we vacate the conviction of insulting or provoking battery, the less serious offense. See *People v. Daniels*, 331 Ill. App. 3d 380, 386-87 (2002) (holding that an aggravated criminal sexual assault conviction based on the infliction of bodily harm is more serious than one based on the display of a dangerous weapon); *People v. Pierce*, 223 Ill. App. 3d 423, 443-44 (1991) (holding that the most serious murder conviction among those based on acts creating a strong probability of death was that involving the greatest amount of injury).

### C. $5-a-Day Credit for Presentencing Incarceration

■ Defendant argues that he is entitled to a $5-a-day credit against his fines for the time he spent in jail before the court sentenced him

(see 725 ILCS 5/110—14 (West 2002)), and the State concedes that this is so. However, given that the fines the court imposed were domestic violence related, we must vacate them. The court imposed one fine under section 5—9—1.5 of the Unified Code of Corrections (730 ILCS 5/5—9—1.5 (West 2002)). That provision provides that "[i]n addition to any other penalty imposed, a fine of $100 shall be imposed upon any person who *** is convicted of *** battery *** [or] domestic battery***; provided that the offender and victim are family or household members as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [(750 ILCS 60/103 (West 2002))]." 730 ILCS 5/5—9—1.5 (West 2002). The section 103 definition is, for these purposes, identical to the definition in section 112A—3 of the Code of Criminal Procedure. Therefore, for the same reason that the State failed to prove that Henningson was a family or household member under section 112A—3, it failed to prove that she was a family or household member under section 103, and the court should not have imposed this fine. The court imposed a second fine under section 5—9—1.6 of the Unified Code of Corrections (730 ILCS 5—9—1.6 (West 2002)). However, a court may impose this fine only on a person with a domestic battery conviction, and we must vacate it due to our reduction of defendant's conviction to one for simple battery.

### III. CONCLUSION

■ Ordinarily, having reduced the level of a defendant's conviction, we would remand the matter to the trial court so that it could sentence him or her in accord with the lower level of the offense. Here, defendant has already served the whole of his sentence for domestic battery, so we have no reason to remand the cause for sentencing for simple battery.

For the reasons given, we affirm defendant's conviction of count I of the complaint as reduced to a conviction for battery, we vacate his conviction of count I, and we vacate his fines.

Affirmed in part as modified and vacated in part.

O'MALLEY, P.J., and BYRNE, J., concur.