2021 IL App (1st) 182299-U

No. 1-18-2299

Order filed February 16, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 00763 |
| | ) | |
| STEPHEN BUTTS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Walker and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's conviction for aggravated domestic battery is affirmed where the evidence was sufficient to show he and the victim had a dating relationship.

¶ 2  Following a bench trial, defendant Stephen Butts was found guilty of two counts of aggravated domestic battery and one count of aggravated battery.[1] The trial court merged the

---

[1] Defendant's first name is also spelled "Steven" in portions of the record on appeal. However, we will use the spelling on the charging instrument and the majority of the reports of proceedings.

counts and sentenced defendant to 180 days in the Cook County Department of Corrections and two years' probation on one count of aggravated domestic battery. On appeal, defendant argues we should reduce his conviction to aggravated battery where the evidence at trial failed to establish that the victim, Brittney Metzen, was a family or household member for purposes of the aggravated domestic battery statute. For the following reasons, we affirm.

¶ 3    Defendant was charged by information with two counts of aggravated domestic battery alleging that on or about November 10, 2015, defendant caused great bodily harm (720 ILCS 5/12-3.3(a) (West 2014)) (count I) and permanent disfigurement (720 ILCS 5/12-3.3(a) (West 2014)) (count II) to Metzen by striking her about the head and body. These counts alleged Metzen was a family or household member as defined in section 112A-3(3) of the Code of Criminal Procedure of 1992 (725 ILCS 5/112A-3(3) (West 2014)) as defendant had a "previous dating relationship" with her. Defendant was also charged with aggravated battery for causing bodily harm to Metzen when he struck her about the head and body with a bludgeon (720 ILCS 5/12-3.05(f)(1) (West Supp. 2015)) (count III).

¶ 4    The trial court granted the State's motion to admit proof of other crimes, in part. It found a June 2013 incident between defendant and his ex-wife was admissible to show propensity to commit domestic violence and an April 2015 incident between defendant and Metzen was admissible to show motive or "lack of accident."

¶ 5    At trial, Metzen testified that she and defendant met in high school when she was 14. They began a "dating relationship" in June 2014. In June 2015, after one year of dating, Metzen moved into defendant's second floor apartment in a duplex on the 10600 block of South Calhoun Avenue in Chicago, Illinois. Around 9:15 p.m. on November 10, 2015, Metzen returned home from work

and let herself in through the downstairs door with her key. She unlocked the apartment door but was unable to enter her apartment because the deadbolt, for which neither she nor defendant had a key, was locked. Metzen repeatedly knocked on the door and called defendant's phone to no avail.

¶ 6     Metzen then heard defendant inside, so she asked him to let her in. Defendant opened the door and "shoved" Metzen down a stairwell. Metzen fell five steps until her "back hit the wall." When she stood up, defendant closed and locked the door. Metzen knocked again and asked defendant to let her in. Defendant responded, "Knock on that door one more time and see what happens." Metzen knocked and defendant opened the door and hit her five or six times in her hands and head with an acoustic guitar before retreating inside the apartment. When Metzen knocked on the door again, defendant let her in. Defendant told her that she "didn't look too good," and she saw that her head was split open. Metzen left the duplex and called 911.

¶ 7     The landlord's husband brought Metzen into the first floor apartment to wait for paramedics. When they arrived, Metzen initially told them that she "fell up the stairs." Metzen testified that she was "protecting" defendant because she "loved him." She also did not feel comfortable "saying everything" in front of the landlord and her husband because they were friends of defendant's family. Later, in the ambulance, Metzen admitted that defendant hit her with a guitar. As a result of the incident, Metzen received 17 stitches in her forehead and four staples on the side of her head, which resulted in scars. She also had a hairline fracture in her right thumb and a broken left middle finger, which required two surgeries and was permanently crooked at the time of trial.

¶ 8     After being released from the hospital, Metzen stayed at her grandmother's house for three days before returning to "defendant's house" for several weeks. She moved out of defendant's

apartment on December 26, 2015. On December 29, 2015, Metzen filed a complaint with Chicago police. Officers accompanied Metzen to the Calhoun apartment where she let them in, retrieved "the rest of [her] stuff," and they arrested defendant. She returned her keys to the landlord that day.

¶ 9    A few months earlier, on April 6, 2015, Metzen and defendant argued at the apartment and defendant called his mother and told her to pick Metzen up before he killed her. During the drive to Metzen's grandparents' house in Highland, Indiana, Metzen, who was seated in the front passenger seat, turned around and argued with defendant, who was seated behind her. He punched her twice in the face with a closed fist. Defendant then grabbed her hair, put his arm around her neck, and squeezed hard enough to cause her trouble breathing. Metzen suffered red scratch marks and bruising on her neck. Later that day, she reported the incident to Highland police.

¶ 10    On cross-examination, Metzen testified defendant gave her a key to the Calhoun apartment. Metzen's name was not on the lease, but her mail and pay stubs reflected that address. During the April 2015 incident, she was at defendant's apartment in order for him to remove a wart from her foot. They were drinking and arguing; defendant started arguing with her again in the car as his mother drove Metzen to her grandparents' house, where she lived before moving in with defendant. On October 27, 2015, defendant's birthday, defendant went out with his cousin and Metzen threw many of defendant's belongings out of the apartment window.

¶ 11    After the November incident, Metzen got back together with defendant. On December 25, 2015, she got into a fight with defendant in Indiana, during which she was "held captive" and bit him. Metzen denied that the fight was because she thought defendant was "with another girl." Their relationship ended the following day.

¶ 12    On redirect examination, Metzen testified that on December 25, 2015, defendant and his cousin locked her in a bedroom and prevented her from leaving by shoving and hitting her for over an hour. Defendant's cousin also drew a firearm at her. The State entered photographs Metzen identified as depicting her injuries resulting from the November and December 2015 incidents with defendant.

¶ 13    Chicago Fire Department paramedic Katrina Basic testified that she responded to the November 2015 incident. Basic entered the first floor apartment of the Calhoun duplex where she met Metzen, who was "bleeding from the head," and had a "severely deformed left finger that was also bleeding." Metzen stated she lived upstairs and fell down the stairs, but Basic noticed "a lot of blood" at the top of the staircase and in the stairwell, which was inconsistent with Metzen's explanation. A man in the second floor apartment did not offer any information when Basic inquired. Basic then put Metzen in an ambulance, where Metzen admitted that defendant struck her with an acoustic guitar.

¶ 14    Chicago police officer Manuel Giron testified that on December 29, 2015, he and other officers accompanied Metzen to the Calhoun apartment to collect her "personal items" and arrest defendant for the November incident. Metzen gave the officers "keys to get into the apartment." As an officer tried to open the apartment door with the keys, defendant opened the door. Police took him into custody and Giron inventoried the guitar Metzen claimed was used to batter her. On cross-examination, Giron stated that Metzen recovered clothes from the apartment.

¶ 15    Molly Gardner, defendant's ex-wife, testified that on June 22, 2013, she and defendant lived in an apartment in Highland, Indiana, with their two children. When Gardner returned home that evening, defendant appeared "[a]gitated and upset," and Gardner suggested he go to sleep.

When Gardner got into bed, she leaned in to kiss defendant, and he "got mad" and told her to leave the room, locking the door behind her.

¶ 16 Gardner waited in the living room for approximately 30 to 60 minutes before pushing open the bedroom door, which had a broken lock. Defendant told her she was not supposed to be there and then followed her as she walked down the hallway. Defendant grabbed the back of her shirt and she turned to face him and backed up. As she backed away, defendant threw household objects into walls. When she was backed into a window, defendant "grabbed" her shoulders and repeatedly "slamm[ed]" her against the glass. Gardner fled to the bedroom, dove facedown onto the bed to reach her phone, and defendant got on her and held her arms behind her back. He then covered her nose and mouth with one hand and placed his other hand on her throat, applying pressure. Gardner's glasses cut her nose, her nose piercing cut the inside of her nose, and her breath was restricted. Eventually Gardner was able to get defendant off her and call 911. She initiated divorce proceedings a few months later.

¶ 17 Defendant testified that he met Metzen in high school. Defendant denied that he had a "dating relationship" with Metzen, but stated that over a period of two years, starting in June 2014, he and Metzen had sex approximately six times. Defendant denied that Metzen lived with him or that he "gave" her a key to his apartment. He testified that he "left" a key to the building's front door for her so she could let herself in the building, but he did not tell her to "keep it." Defendant put a deadbolt on his apartment door to which only he had a key.

¶ 18 On April 5, 2015, defendant invited Metzen over. He was going to remove a wart from her foot. At some point, defendant and Metzen began to argue, causing defendant's landlord, Lisa Ramirez, to knock on his door. Metzen and Ramirez then began to argue, and Ramirez said she

was going to call the police. Defendant asked Ramirez not to, testifying that he did not want Metzen to go to jail because she was his "friend," whom he had known for a long time. Defendant's mother then picked him and Metzen up to drive them to Indiana. Defendant testified that he never struck, scratched, or choked Metzen on the drive, although he did subdue her with a knee to the back of her neck as he was trained to do in the military.

¶ 19    On defendant's birthday on October 27, 2015, Metzen appeared at his apartment uninvited. Defendant had plans with his cousins and told Metzen she could not join them but could stay at his apartment. Defendant testified that he told her to stay because he "probably wanted to have sex." When defendant returned that evening, he found his belongings, including his guitar, had been thrown outside. Defendant's guitar was damaged as a result.

¶ 20    On November 10, 2015, defendant was asleep when he heard "pounding" at the door. He asked who it was, Metzen identified herself, and defendant told her to go away. Metzen was not living with him, and had not been at the apartment for about two and a half weeks, since his birthday. The only items she had there were "[m]aybe like a dirty bra or a tank top" and a toothbrush. Metzen continued "pounding" on the door, so defendant opened it to tell her to stop, and Metzen grabbed the door with one hand and left the other in the doorway. Defendant shut the door on Metzen's hands, causing her to fall backwards down the stairs.

¶ 21    Defendant heard Metzen fall down the stairs and scream, "My hand. My hand." Defendant opened the door and saw Metzen with a "deformed" hand and bleeding head. Defendant then let her into the apartment and told her to call an ambulance. When paramedics arrived, defendant told them to "[g]et [Metzen] out" and that he did not "want nothing to do with her." A few days later,

defendant and his cousin picked Metzen up from "[h]er house" in Highland because he felt bad about her hand.

¶ 22    On the evening of December 25, 2015, after he celebrated Christmas with his family, defendant and his cousin again picked Metzen up and they hung out together at his cousin's house and a neighbor's. Metzen got mad at defendant when he was speaking to another girl, and began attacking him. She bit defendant's bicep and he pulled her hair to get her off. They ended up "wrestling" in a bedroom at his cousin's until Metzen screamed for help, drawing a neighbor's attention, who drove defendant home. Defendant denied that his cousin had a firearm that evening or "contained" Metzen in the bedroom. The defense entered photograph exhibits of defendant taken after the incident, which he testified showed his injuries from the incident.

¶ 23    In regard to the June 2013 incident with Gardner, defendant testified that Gardner was mad at him, punched holes in the wall, and initiated a physical confrontation. Defendant denied that he choked her, followed her through the apartment, or slammed her against a window.

¶ 24    On cross-examination, defendant testified he never dated Metzen and she never lived with him. Metzen's job was "a couple of blocks" from his apartment. Sometimes he would ask his mother and cousin to drive Metzen to his apartment. During the April 2015 drive, Metzen and defendant's mother hit each other and pulled each other's hair. He did nothing beyond subduing Metzen. On October 27, 2015, Metzen came to spend time with him on his birthday but he left the apartment because he had plans. He did not hit her with a guitar during the November 2015 incident. The last time he had sex with her was before Christmas in December 2015. The argument on Christmas began because Metzen became jealous when she thought he was flirting with another girl.

¶ 25    Ramirez testified that she lived in the first floor apartment of the Calhoun duplex and rented the second floor apartment to defendant. He lived alone, installed a deadbolt on his apartment door, and had a key to it. Metzen did not live in the building, but would "come by and see [defendant] from time to time." On cross-examination, Ramirez testified defendant did not have a lease and rented month-to-month.

¶ 26    Gail Galich, defendant's mother, testified defendant lived in the Calhoun apartment alone. On April 5, 2015, defendant called her to pick up Metzen and "take her home" to Highland, Indiana, where Metzen lived. During the drive, Metzen repeatedly attacked Galich and defendant. Defendant did not physically harm Metzen throughout these attacks.

¶ 27    On cross-examination, Galich testified that prior to that incident, she had met Metzen "a couple of times." Galich recalled that defendant told Galich he had "met a girl," and upon seeing Metzen, Galich said he must "have a type" because she looked like Gardner. Galich claimed that Metzen was not defendant's "girlfriend," and that defendant was not dating her. Galich testified that Metzen did not live in the Calhoun apartment.

¶ 28    Highland Indiana police officer Shawn Anderson testified that he responded to the June 2013 incident between defendant and Gardner. He could not recall if Gardner told interviewing officers that defendant slammed her against a window. Gardner did not tell him that defendant choked her. The defense entered photographs taken the next day of Gardner's injuries, which Anderson testified showed swelling on the side of her face and cheek and bruising on her left arm and wrist. On cross-examination, Anderson testified that there were holes in the apartment walls.

¶ 29    In rebuttal, the State entered a stipulation that, if called to testify, Indiana State Police trooper Daly[2] would testify that around 9:50 p.m. on April 6, 2015, he was dispatched to Highland Police Department to make a report of an alleged battery that occurred on Interstate 80 Eastbound. Daly met Metzen at the department and observed she had several injuries to her lip, eye areas, nose, neck, arms, and back. He later interviewed Galich, who provided that Metzen choked her and poked her chest.

¶ 30    The trial court found defendant guilty on all counts. The court noted:

> "And the issue here is the defendant testified that the complaining witness was someone he just basically had some casual hookups with. He'd known her since high school and he had sex with her about six times. But the testimony of everyone here undercuts that testimony as far as I'm concerned. I agree that there probably was not a formal dating relationship, but there was a dating relationship here in this Court's view. I do believe the complaining witness' testimony about her having a relationship with the defendant.

> Now, whether or not she lived there, I don't know. And she probably stayed there. I think the fact that her job was only a few blocks away cuts definitely towards that. I don't think she actually had some formal relationship living there. But I think she was there more often than the defendant is willing to admit. The fact that she just happens to appear at holidays and other occasions definitely points to a far greater relationship. And I think her relationship with the defendant certainly falls under the *** legal definition of a dating relationship."

---

[2] Trooper Daly's first name does not appear in the report of proceedings.

¶ 31    Defendant filed a motion for a new trial, which the court denied. The court merged counts II and III into count I and sentenced defendant to 180 days in the Cook County Department of Corrections and two years' probation on the aggravated domestic battery count premised on great bodily harm.

¶ 32    On appeal, defendant argues we should reduce his conviction to aggravated battery where the evidence at trial failed to establish that Metzen could be considered a "family or household member" as required to prove aggravated domestic battery. He contends the evidence reflected only a pattern of casual sexual encounters and not that he and Metzen shared a dwelling or had a "dating relationship" as required under the statute.

¶ 33    The question when reviewing a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the required elements beyond a reasonable doubt." *People v. Newton*, 2018 IL 122958, ¶ 24. This standard of review recognizes that it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court does not retry the defendant. *Newton*, 2018 IL 122958, ¶ 24. Thus, we will only overturn a conviction where "the evidence is so unreasonable, improbable, or unsatisfactory" that guilt is not proven beyond a reasonable doubt. *Id.*

¶ 34    To support the conviction for aggravated domestic battery, the State had to prove that defendant caused great bodily harm to Metzen during his commission of domestic battery. 720 ILCS 5/12-3.3(a) (West 2014). Domestic battery occurs when someone knowingly and without lawful justification causes bodily harm to a "family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2014).

¶ 35    The definition of a "family or household member" in section 112A-3 of the Code of Criminal Procedure of 1963 includes "persons who have or have had a dating or engagement relationship," but specifically excludes "a casual acquaintanceship [or] ordinary fraternization between 2 individuals in business or social contexts." 725 ILCS 5/112A-3(3) (West 2014). This court has described a "dating relationship" as one that is "more serious and intimate than casual," and as a "serious courtship." *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 653 (2003). In turn, a "serious courtship" has been described as "an established relationship with a significant romantic focus." *People v. Young*, 362 Ill. App. 3d 843, 851 (2005).

¶ 36    After reviewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found defendant and Metzen had a dating relationship. Metzen testified that she and defendant began a "dating relationship" in June 2014. After one year of dating, she and defendant began living together in defendant's apartment. Metzen had a key to both the apartment building and the apartment, which she testified defendant gave to her, and kept personal belongings there. Officer Giron testified Metzen gave keys to police to let them inside to arrest defendant in December 2015. Giron also testified that while at the apartment, Metzen collected items of clothing. Metzen testified she "loved" defendant, was with him on his birthday and Christmas, and he helped her with the intimate act of removing a wart from her foot. Taken as a whole, the evidence that defendant and Metzen dated for over a year before she moved in with him, she lived with him for months, she had a key to and personal items at his apartment, and spent time with him on his birthday and Christmas support a finding that they had an "established relationship with a significant romantic focus." *Id.*; *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict.").

¶ 37 Nevertheless, citing *People v. Young*, 362 Ill. App. 3d 843 (2005), and *People v. Howard*, 2012 IL App (3d) 100925, defendant argues the evidence shows his and Metzen's relationship was casual and primarily sexual, not a "serious courtship" or "established relationship with a significant romantic focus" required for a dating relationship under section 5/112A-3(3). *Young* and *Howard* are distinguishable.

¶ 38 In *Young*, the court determined there was no evidence of "a romantic element" in the defendant's relationship with the victim where he had only tried to kiss her once and they spent the night at the same homeless shelter. *Young*, 362 Ill. App. 3d at 852. In *Howard*, both the defendant and the victim denied dating each other despite having 15 sexual encounters over a year and a half. *Howard*, 2012 IL App (3d) 100925, ¶ 5. The victim stated their relationship was "strictly sexual," and the defendant considered it "a series of one-night stands." (Internal quotation marks omitted.) *Id.* Furthermore, the defendant and the victim "had never spent an entire night together and did not spend much time in each other's company outside the presence of their group of friends." *Id.*

¶ 39 In contrast to those cases, here, Metzen testified that she and defendant were in a "dating relationship," and that they lived together. Defendant and Metzen agreed that she had a key to the building and kept some of her belongings at the apartment she alleged they lived in together. Defendant's landlord saw Metzen at the apartment several times. The evidence showed defendant's mother and cousin picked up Metzen on various occasions to allow defendant to spend time with her, including on Christmas, and defendant alleged Metzen became jealous when he spoke to another girl that night. Defendant's mother, Galich, testified that defendant told her he

"met a girl," she met Metzen multiple times, and she believed defendant had a "type" based on Metzen's physical similarities to his ex-wife, Gardner.

¶ 40 In his reply brief, defendant contends he is not challenging the court's factual findings on the credibility of the witnesses but rather its determination that a relationship that is not a formal dating relationship is the type of serious courtship contemplated by the statute. However, nothing in the statute or the cases cited by defendant requires that a dating relationship be formalized in any way. All the statute requires is that the relationship be more than "a casual acquaintanceship [or] ordinary fraternization" (725 ILCS 5/112A-3(3) (West 2014)), which this court has interpreted as requiring the relationship be a courtship "more serious and intimate than casual" (*Westcott*, 343 Ill. App. 3d at 653). We find the evidence amply supports the trial court's finding that defendant and Metzen had a "dating relationship" as contemplated under the statute. 725 ILCS 5/112A-3(b)(3).

¶ 41 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 42 Affirmed.