NOTICE

Decision filed 09/30/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230242-U

NO. 5-23-0242

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 22-CF-417 |
| | ) | |
| ISAACH C. PEPPERS, | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm where the State presented sufficient evidence to prove defendant guilty of domestic battery.

¶ 2    Following a jury trial in the circuit court of Effingham County, defendant, Isaach C. Peppers, was convicted of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2022)) and sentenced to three years in prison to be followed by four years of mandatory supervised release. Defendant appeals, arguing that the State failed to prove, beyond a reasonable doubt, that defendant and the victim were either in a dating relationship or household members as required for domestic battery. We affirm.

¶ 3                                I. Background

¶ 4    On December 6, 2022, the State charged defendant by information with one count of domestic battery (*id.*), a Class 4 felony (*id.* § 12-3.2(b)). In support, the State alleged that on

1

December 5, 2022, defendant knowingly made physical contact of an insulting or provoking nature to Amber Sandstrom, a family or household member of defendant, in that defendant punched Sandstrom multiple times in the face, after having been previously convicted of the offense of domestic battery in Christian County, Illinois (case No. 19-CF-157). A grand jury subsequently returned a bill of indictment charging defendant with the same.

¶ 5       On February 28, 2023, the matter proceeded to a jury trial.[1] At trial, the State called three police officers employed by the Effingham Police Department, Officer Jerrod Purcell, Officer Matthew Simpson, and Officer David Myers. The officers' testimony generally established that defendant and Sandstrom were involved in an altercation at defendant's residence on December 5, 2022. The testimony indicated that on that date, defendant and Sandstrom argued over defendant's "wifi hotspot," defendant asked Sandstrom to leave his apartment, defendant claimed Sandstrom pushed defendant, defendant claimed Sandstrom prevented defendant from leaving his apartment, and defendant punched Sandstrom in the face. Defendant called police after the altercation. When police arrived, defendant was located at his residence and Sandstrom was located at a residence several blocks away. Officers observed blood in defendant's residence and on his clothing. Officers observed swelling, discoloration, and lacerations on Sandstrom's face, as well as blood on her clothing. Photographs depicting the blood in defendant's residence, the blood on defendant's clothing, Sandstrom's face, and the blood on Sandstrom's clothing were admitted into evidence at trial. Defendant was taken into custody after the officers conducted their investigation.

¶ 6       Officer David Myers testified that he spoke with defendant about the altercation on December 5, 2022. When asked if defendant described the nature of the relationship, Officer Myers responded, "As a dating relationship." Officer Myers later clarified that "[defendant] didn't state

---

[1]We limit our recitation of the evidence adduced at trial to that which is relevant to the issue on appeal.

they were in a dating relationship. [Sandstrom] did." When asked what defendant said about his relationship with Sandstrom, Officer Myers responded, "He couldn't remember her last name. He was kind of unfamiliar with her." On cross-examination, Officer Myers agreed that he obtained Sandstrom's information when he spoke with her on December 5, 2022. Officer Myers agreed that the information he obtained included Sandstrom's full name, birthday, driver's license number, and address. Officer Myers agreed that the address Sandstrom provided was in Jewett, Illinois.

¶ 7    The State also called Sandstrom to testify at trial. Sandstrom testified that she was originally from Kankakee, Illinois, but that she had lived in Effingham County for five years preceding trial. Sandstrom clarified that she lived between Effingham County and Cumberland County. Sandstrom had a prior conviction for use of a forged debit or credit card in Cumberland County. She also had several prior convictions in other counties for theft and retail theft. Sandstrom had several pending charges for residential burglary, burglary to a vehicle, and theft in Effingham County.

¶ 8    Sandstrom testified that she knew defendant because they "dated" previously. Sandstrom explained that she was "like staying with him, and then [she] left town and [she] came back, and he asked [her] to stay there again." Sandstrom first stayed with defendant at his apartment for a few weeks in September or October 2022. When asked how she began staying with defendant, Sandstrom responded, "I met him at a friend's house and we just started talking. Well somebody else was actually living there to[o], and I was friends with both of them." Sandstrom testified that defendant invited her to stay with him. When asked if she was in a dating relationship with defendant, Sandstrom responded, "Yeah. I thought so. Yeah." Sandstrom testified that the relationship was sexual in nature, and that the relationship initially lasted for approximately two to three weeks.

¶ 9      Sandstrom testified that she left defendant's residence and went to Champaign, Illinois, but returned to Effingham, Illinois, towards the end of November for a court date. Sandstrom arrived by train and walked to defendant's residence. Sandstrom agreed that she arrived "unannounced" because she had nowhere else to go. Sandstrom was with John Ward, her ex-boyfriend, when she arrived at defendant's residence. Defendant invited the two into his residence. According to Sandstrom, Ward left after several days but Sandstrom continued to stay with defendant. Sandstrom and defendant resumed their sexual relationship when she returned in late November. When asked if she planned to stay with defendant long-term, Sandstrom responded, "I was going to stay but things started getting weird so I was trying to find a ride to go, but I didn't have a definite place to go." Sandstrom explained that she and defendant had been arguing over her use of his wifi. Sandstrom needed defendant's wifi to use her phone because she did not have any "minutes."

¶ 10     Sandstrom testified regarding her recollection of the events that took place on December 5, 2022. Sandstrom was asleep in bed with defendant that morning. She woke up and made herself food while defendant remained in bed. Shortly thereafter, defendant began yelling at Sandstrom about her use of the wifi. Defendant then punched Sandstrom in the face with a closed fist, causing her to bleed. Sandstrom clarified that defendant struck her in the nose, causing swelling and two black eyes. Sandstrom testified that she fell to the ground and defendant continued to punch her in the back of her head several more times. Sandstrom denied pushing defendant prior to him punching her and denied attempting to prevent defendant from leaving his apartment. Defendant then pushed her out of his apartment, and she left.

¶ 11     Sandstrom testified that the apartment was in defendant's name, but he gave her a key. Sandstrom had a key when she stayed with defendant in September or October 2022, but he

requested that she return the key before she left. He again gave her a key when she returned in November 2022. Sandstrom used the key to get in and out of the apartment.

¶ 12    On cross-examination, Sandstrom testified that she met defendant shortly after her imprisonment for the forged credit card offense. Sandstrom clarified that a person named "Ally" lived at defendant's apartment when she lived there in September or October 2022. Sandstrom admitted that she did not plan to stay with defendant when she returned at the end of November 2022. Sandstrom originally planned to return to Champaign but ended up staying with defendant. Sandstrom claimed that she received mail at defendant's address. Sandstrom agreed that she spoke with police the day after the altercation and indicated that her address was in Jewett. At the time of the trial, Sandstrom was in jail on a three-count felony indictment for residential burglary, burglary to a motor vehicle, and theft.

¶ 13    On redirect, Sandstrom testified that the Jewett address was her "parole address." On recross, she testified that her parole address changed several times, but she agreed that she never listed defendant's address as her parole address. Sandstrom agreed that she was on parole on December 5, 2022. When asked if she told her parole officer she was living in Jewett, Sandstrom responded, "My parole at that time was in Champaign. I just came back. I mean I just got off the train. I was only in town like a week. I missed court. I couldn't find a ride to court so, you know—[.]" Sandstrom explained that she originally lived in Jewett but then her "parole address changed to Effingham, and then [her] parole address changed to Newton, and then [her] parole address changed to Champaign." Sandstrom again confirmed that her parole address was never defendant's address.

5

¶ 14　Following deliberations, the jury found defendant guilty of domestic battery. The trial court sentenced defendant to three years in prison, with credit for time served (120 days), and four years of mandatory supervised release. Defendant filed a timely notice of appeal.

¶ 15　　　　　　　　　　　　　　II. Analysis

¶ 16　On appeal, defendant argues that the State failed to prove, beyond a reasonable doubt, that he and Sandstrom were "family or household members" as required for domestic battery. The State argues that the evidence was sufficient to prove defendant guilty of domestic battery. We agree with the State.

¶ 17　"A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Id.* "This standard of review applies regardless of whether (1) the evidence is direct or circumstantial, or (2) the defendant receives a bench or jury trial." *People v. Pickens*, 354 Ill. App. 3d 904, 911 (2004) (citing *People v. Cooper* 194 Ill. 2d 419, 431 (2000)).

¶ 18　With these principles in mind, we consider defendant's argument that the State failed to prove him guilty, beyond a reasonable doubt, of domestic battery. To sustain a conviction for

6

domestic battery, as charged here, the State was required to prove that defendant (1) knowingly, (2) without legal justification, (3) made physical contact of an insulting or provoking nature, (4) with any family or household member. 720 ILCS 5/12-3.2(a)(2) (West 2022).

" 'Family or household members' include *** persons who share or formerly shared a common dwelling[ ] [and] *** persons who have or have had a dating or engagement relationship ***. For purposes of this Article, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." *Id.* § 12-0.1.

¶ 19    Here, defendant only challenges the sufficiency of the evidence with regard to the fourth element, arguing that the State failed to prove that he and Sandstrom were either "household members" or in a "dating relationship." Defendant asserts that the evidence demonstrated the following: (1) Sandstrom stayed at defendant's residence out of necessity between rides on her way to a court date; (2) there was no evidence of a relationship beyond a few sexual encounters; (3) both of Sandstrom's stays with defendant were short, random, and unplanned; and (4) Sandstrom's stays were brief. Defendant argues that the present case is similar to *People v. Young*, 362 Ill. App. 3d 843 (2005), and *People v. Howard*, 2012 IL App (3d) 100925.

¶ 20    In *Young*, the Second District held that the State failed to prove that the defendant was either a household member of, or in a dating relationship with, the victim as required for domestic battery. 362 Ill. App. 3d at 848-51. In rejecting the State's argument that the defendant and the victim were household members, the Second District concluded that the fact that the defendant and the victim had "stayed in the same shelter the night before the offense and the implication in her testimony and [the] defendant's that the two had chosen to stay in the same shelter on other nights were insufficient to prove that the two were members of the same household." *Id.* at 848-

7

49. The Second District reasoned that "shared lodgings are not a shared dwelling unless the living arrangement has a degree of permanence" and that "two people do not become a household by virtue of lodging together unless that lodging together is an established mode of living." *Id.* at 849. The Second District concluded that "for two people to 'share a common dwelling' is for them to stay in one place together on an extended, indefinite, or regular basis." *Id.* The Second District further noted that "a host and an ordinary houseguest do not share a common dwelling; the host dwells—lives—in the house, but the guest merely lodges—stays—there." *Id.* The Second District went on to note that "[a] transitory sharing of accommodations (particularly mass accommodations, as in a shelter) is not, by itself, a mark of an intimate relationship." *Id.* at 850. Thus, the Second District concluded that the evidence failed to "establish any regularity in the places the two stayed, so evidence of any place that was ever a common dwelling for the two is lacking." *Id.*

¶ 21     The Second District also rejected the State's argument that the evidence was sufficient to show that the defendant and the victim were in a dating relationship. *Id.* In doing so, the Second District noted that it was not enough for the State to show the defendant and the victim "had an *intimate* relationship; it must show that they had a *dating* relationship or other relationship that falls within the definition." (Emphases in original.) *Id.* at 851. The Second District noted its prior holding that "a ' "dating relationship" is a serious courtship,' 'a relationship that [is] more serious and intimate than casual.' " *Id.* (quoting *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 653 (2003)). The Second District noted its prior conclusion that a single lunch date did not amount to a dating relationship. *Id.* (citing *Alison C.*, 343 Ill. App. 3d at 653). The Second District concluded that a serious courtship "must be, at a minimum, an established relationship with a significant romantic focus." *Id.* The Second District noted that the evidence of a romantic element to the relationship

between the defendant and the victim was scant, where the two only spent the night together in a homeless shelter and the victim used the word " 'social' " to describe her relationship with the defendant. *Id.* at 852. The Second District concluded that "[t]he most a reasonable person could conclude on this evidence is that the two had a pattern of companionship that may have included an element of romantic interest, at least on [the] defendant's part." *Id.* Because the Second District found the evidence insufficient to support a finding that the defendant and the victim were household members or in a dating relationship, it reduced defendant's conviction to the lesser included offense of battery. *Id.*

¶ 22      In *Howard*, the Third District held that the evidence was insufficient to show that the defendant had a dating relationship with the victim as required for aggravated domestic battery. 2012 IL App (3d) 100925, ¶ 11. The Third District noted that the trial evidence "established that [the] defendant and the victim had numerous sexual encounters," but the Third District concluded that it was "not enough to show that [the] defendant and the victim had an intimate relationship." *Id.* ¶ 10. The Third District, citing *Young*, concluded that the State was required to show that the defendant and the victim had a dating relationship. *Id.* The Third District, relying on the reasoning of the Second District in *Young*, defined dating relationship "to mean serious courtship, which must be, at a minimum, an established relationship with a significant romantic focus." *Id.* In concluding that the evidence was insufficient to show a dating relationship, the Third District noted:

> "While [the] defendant and the victim clearly had an established relationship, we do not find that their relationship had a romantic focus. Both [the] defendant and the victim testified that they were not dating and [the] defendant stated that he never bought the victim flowers. [The] [d]efendant and the victim were not exclusive, and the relationship did not

9

contain any sort of shared expectation of growth. Rather, [the] defendant and the victim engaged in random sexual encounters which were physical in nature, not romantic." *Id.* Thus, the Third District reduced the defendant's conviction to aggravated battery. *Id.*

¶ 23    We find the facts of the present case distinguishable from those in *Young* and *Howard*. Unlike *Young*, where the defendant and the victim stayed several nights in the same homeless shelter, here, defendant and Sandstrom resided together in defendant's residence for a total period of several weeks. Sandstrom testified that defendant provided her a key to his residence, which she used when she entered and exited the residence. When asked if she planned to stay with defendant long-term, Sandstrom responded, "I was going to stay but things started getting weird so I was trying to find a ride to go, but I didn't have a definite place to go." This testimony could be viewed as demonstrating that Sandstrom planned to stay with defendant at his residence for an indefinite time period, but her plans to stay with him did not work out. In our view, this evidence, when viewed in a light most favorable to the State, was sufficient to demonstrate that defendant's residence was a common dwelling between defendant and Sandstrom, albeit for a brief time period.

¶ 24    In addition, unlike *Young* and *Howard*, where there was no testimony that the defendant and the victim were in a dating relationship, here, Sandstrom testified that she was in a dating relationship with defendant. Sandstrom's testimony demonstrated that she stayed with defendant for a period of time, during which she shared his bed and had a sexual relationship with him. As noted, Sandstrom also testified that defendant provided her a key to his residence, which she used when she entered and exited the residence. While Officer Myers's testimony indicated that defendant was unfamiliar with Sandstrom, we note that Sandstrom's testimony indicated that she believed she was in a dating relationship with defendant. Sandstrom testified that she planned to stay with defendant but the two began fighting. In our view, this evidence, when viewed in a light

10

most favorable to the State, was sufficient to demonstrate that defendant and Sandstrom were in a dating relationship.

¶ 25    We acknowledge that Sandstrom's credibility was challenged by her prior convictions and pending charges. Despite this, the jury chose to believe Sandstrom's testimony and this court cannot say that the jury's credibility determination was unreasonable. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71 ("The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses.").

¶ 26    In light of the foregoing, we conclude that the evidence, when viewed in a light most favorable to the State, was sufficient to establish that defendant and Sandstrom were family or household members. Thus, we hold that the evidence was sufficient to prove defendant guilty, beyond a reasonable doubt, of domestic battery.

¶ 27                                    III. Conclusion

¶ 28    For the foregoing reasons, we affirm the judgment of the circuit court of Effingham County.


¶ 29    Affirmed.