2022 IL App (2d) 210309
No. 2-21-0309
Opinion filed July 11, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CM-1138 |
| BRANDON SCOTT PENCE, | ) ) | Honorable Michael W. Feetterer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Brandon Scott Pence, was convicted of two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2020)). Those counts merged for sentencing purposes, and defendant was sentenced to six months in jail. On appeal, defendant argues that he was not proved guilty beyond a reasonable doubt. More specifically, he contends that his convictions should be (1) reversed because they are based on the uncorroborated and inconsistent testimony of the victim, who admitted having ingested heroin and fentanyl four hours before the incident, or (2) reduced to simple battery because the State failed to prove that defendant was a "household member." See *id.* § 12-0.1. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The trial evidence consisted of testimony from Michelle Brandt (the victim), Calli Pence (Calli) (defendant's 31-year-old sister and Brandt's friend), and Kristina King (a friend of defendant's and Calli's and, undisputedly, Brandt's roommate). Also admitted at trial were photographs of Brandt's injuries and the inside of her house.

¶ 4    Brandt testified that, in September 2020, she lived on Valley Drive in Oakwood Hills. Living with her were defendant, Calli, and King. They moved in with Brandt in August 2020. In exchange for a place to live, defendant, Calli, and King helped Brandt with household chores, such as cleaning, buying groceries, and preparing meals. None of the three had keys to the house. Although Brandt was not "paying really many bills at the time, *** [defendant] did put the Wi-Fi in his name."[1]

¶ 5    At around 11 p.m. on September 23, 2020, Brandt ingested intravenously "[a] bag or two" of heroin and fentanyl. When asked whether "those substances affect[ed her] memory of that night at all," Brandt responded, "No."[2] Sometime after 11 p.m., Brandt went to sleep.

¶ 6    On September 24, 2020, at approximately 3 a.m., defendant came to Brandt's room and began yelling at her about "some bad checks" he had heard Calli and King discussing. Defendant, who appeared angry, told Brandt that he, Calli, and King were going to leave.

¶ 7    For 20 to 30 minutes, the argument continued while defendant, Calli, and King packed their belongings, which included clothes, towels, and bedding. They left, and Brandt remained in her home.

---

[1]Brandt eventually lost possession of the home in foreclosure proceedings.

[2]Brandt testified that she would inject heroin and fentanyl in her arms and feet. She stopped using these drugs in February 2021, approximately three months before defendant's trial.

¶ 8        Less than one minute after they left, Brandt heard knocking at her front door. She walked to the front door, asked " '[W]hat's up,' " and unlocked the door. The door was then broken down. Defendant and Calli entered through the doorway; she did not see who entered first. Calli, who had her hands in fists, said she was going to fight Brandt. Brandt tried to talk to Calli, asking why she was acting that way. Calli, however, proceeded to hit Brandt several times while defendant held Brandt's arms back. Defendant, too, then began hitting Brandt several times near her face.

¶ 9        During the fight, defendant picked up a slab of glass that was fitted into a coffee table in the living room. Defendant broke the glass over Brandt's head while she was fighting with Calli on the floor in the living room. Brandt explained that defendant lifted the glass over his head and hit her "[o]n the side of [her] head, right side of [her] head," "[u]p by [her] eye." While so stating, Brandt motioned to the upper right side of her head. When the glass broke over Brandt's head, "it shattered."

¶ 10      Brandt testified that the coffee table was oval. She estimated that the glass insert was the width of the witness stand and one-quarter inch thick.

¶ 11      When asked what defendant did after breaking the glass insert, Brandt responded that "there was [*sic*] two small coffee tables *** and he broke one of those on the floor." After the "glass tables" were broken, the fight ended. King, who was standing in the doorway to the living room, began yelling, " 'Let's go, let's get out of here.' " Defendant, Calli, and King left. Defendant then broke two windows from the outside. One of those windows was in the living room. After defendant, Calli, and King drove away, Brandt called 911. She was taken to Good Shepherd Hospital, where she was treated for her injuries. She was also administered a computerized tomography (CT) scan of her head. She was at the hospital for one or two hours.

¶ 12    Brandt testified that her injuries included bruising and swelling to her face, cuts to her hands, and a piece of glass stuck in her left leg. The glass became stuck in her leg while she was "rolling around" on the floor with Calli. The State introduced photographs of Brandt after the incident, showing a bandaged bloody wound to her right leg, cuts on her hands, redness on her face, and a red and swollen bump on the upper right side of her face.

¶ 13    The State also introduced photographs of the coffee table and the living room. The table appears three to four feet long and two to three feet wide. The living room floor is littered with glass shards. Near the coffee table is a cluster of larger glass pieces that appear thicker than the others. Concerning this "pile" of glass, Brandt was asked, "And is that the glass that was on the coffee table? Or much of that glass, is that the glass that was on that coffee table?" She answered yes. These larger pieces of glass appear to be one-quarter to one-half inch thick.

¶ 14    On cross-examination, Brandt was shown a document on a computer screen near the witness stand. She identified the document as her statement to the police. Brandt admitted that she told the police that (1) her fight with Calli continued even after defendant broke the table's glass insert over her head and (2) "they broke a window" when they left. However, Brandt testified that the fight ended when defendant broke the glass insert. She also admitted that she mentioned one broken window, not two, to the police and that she did not say who broke the window. She also admitted that she saw both Calli and defendant enter when the door fell in and did not see who knocked down the door. On redirect examination, Brandt confirmed "that [she] did not see who broke the windows" after defendant, Calli, and King left.

¶ 15    Officer James Petty testified that he was dispatched to an address on Valley Drive at approximately 4 a.m. on September 24, 2020. When he arrived, Brandt was in the living room. She was scared, distraught, stressed, "kind of out of sorts," and crying. Although Officer Petty

agreed that drug addicts can exhibit similar behavior, he had no "reason to believe that [Brandt] might have been high on heroin or fentanyl that day." Officer Petty observed that Brandt had small cuts to her arms and face and a large laceration to her right thigh. Officer Petty also testified that there was broken glass all over the living room, two windows were broken, and the front door frame was cracked. Officer Petty described the glass—at least some of which came from the top of the coffee table—as "heavy" and approximately one-half inch thick. Officer Petty did not handle the glass but only visually inspected it. Officer Petty indicated that he saw a one-foot crack to the door frame, push and pry marks, and wood shavings around both the inside and outside of the door. Photographs admitted at trial confirmed this damage.

¶ 16    After surveying the damage, Officer Petty went to Good Shepherd Hospital to talk to Brandt, believing that defendant and Calli would also arrive there. When they failed to arrive, Officer Petty spoke to defendant on the phone. Officer Petty told defendant that he needed to come to Good Shepherd Hospital so that they could talk. Defendant told Officer Petty that he was going to Alexian Brothers Hospital, which Officer Petty characterized as "quite a ways away" from Brandt's home—"they would have to skip multiple hospitals to get to that hospital." Officer Petty again advised defendant that they needed to talk, "[w]ords were said," and Officer Petty advised defendant that he would obtain a warrant for defendant's arrest if he refused to talk to the police. Defendant replied, "Good," and then hung up the phone. Officer Petty obtained a warrant and arrested defendant and Calli.

¶ 17    King testified that she has known defendant and Calli for 12 years. King met Brandt through Calli and dated defendant in September 2020. King began living with Brandt around July 2020. King needed a place to stay, and Brandt helped her out. Although defendant and Calli would

often visit King at Brandt's house, neither defendant nor Calli lived there. King did not have a key to the house and did not pay rent. Sometimes she would "help shoot [Brandt] up" with "narcotics."

¶ 18    On September 23, 2020, King, defendant, Calli, and Brandt were at Brandt's house. King went to sleep in her room, but she was awakened when she heard Brandt and Calli arguing. King went to investigate and saw Brandt on top of Calli in the living room. Defendant was sitting on a couch in the room. King stated that defendant "just basically lifted [Brandt] up and took her off [Calli]." Defendant was calm and not angry or aggressive when he removed Brandt from Calli. King testified that no glass was on the floor while Brandt and Calli were fighting.

¶ 19    After defendant separated Brandt and Calli, defendant helped King pack her belongings. Packing took about 15 to 20 minutes. Calli waited for defendant and King in defendant's car. While King was transporting her things to defendant's car, she observed Brandt breaking the tables in the living room, including the glass insert to the coffee table.

¶ 20    When King, defendant, and Calli left Brandt's house, they went to defendant and Calli's family home. Because Calli had sustained a few injuries and defendant had glass in his foot, they then went to nearby Alexian Brothers Hospital.

¶ 21    Calli testified that, in September 2020, she lived in Itasca with her mom and siblings, including the 26-year-old defendant. She and Brandt were "good friends" and she had been to Brandt's house over 1000 times in the approximately three years that she had known Brandt. She never lived with Brandt, although "at one point" she used Brandt's address to receive mail. Calli did not have a key to Brandt's home, and she neither had a bedroom nor kept her belongings there. Defendant, too, never lived in Brandt's home. However, all of them "would hang out" at Brandt's home, and it was not unusual for them to be up until early in the morning, as they "were night owls."

¶ 22    On September 23, 2020, Calli was at Brandt's house with defendant and King. At 4 a.m. on September 24, 2020, Brandt stormed out of her room. She was angry because defendant refused to take her to the city to buy heroin. Brandt then attacked Calli, pushing her to the floor. Calli did not know why Brandt attacked her; Brandt said nothing to her before the fight began. Calli believed that Brandt was just "crazy." Brandt "picked up the glass tables, threw them," and then jumped on top of Calli. Glass was all over the floor, and some of it cut Calli's forearm, leaving a scar. Defendant, who was by the front door (and not sitting on the couch as King testified), was also cut when glass hit the top of his right foot. Defendant then "[v]ery gently" removed Brandt from Calli and slung Calli over his shoulder. Defendant took Calli outside to his car. King, who was also in the living room, "[i]mmediately" left the home with defendant and Calli. They drove to defendant and Calli's house and then to Alexian Brothers Hospital.

¶ 23    In closing argument, the State highlighted the contradictions between King's and Calli's testimony. The State also emphasized Brandt's testimony that defendant lived with her, helped with household chores, and put the Internet service in his name. In response, defendant stressed that he had no keys to the home, and he argued that Brandt's testimony was incredible given that she had ingested heroin and fentanyl shortly before the altercation.

¶ 24    Before ruling, the trial court took time to consider all the evidence presented. It asked for "the photographs" and "[superseding] information" to aid it in its decision.

¶ 25    In finding defendant guilty of both counts of domestic battery, the trial court issued a lengthy ruling on the record. It noted that "there's no question that [Brandt] neither broke her windows nor kicked her own door in. It was either defendant or [Calli]." "[T]hose are acts of anger." "[O]bviously, tempers were hot, people were upset, *** fisticuffs between [Calli] and

[Brandt]." Also unrebutted were that (1) defendant, Calli, and King helped with household chores, (2) none of them had a key to the house, and (3) defendant put the Internet service in his name.

¶ 26    The court also addressed Brandt's drug use, noting that she ingested heroin and fentanyl four hours before the altercation. Although "no testimony [was presented] about the effect of heroin combined with fentanyl on the human body," the court determined that "an inference to be drawn is that when somebody's under the influence of heroin and fentanyl, their [*sic*] ability to perceive is impaired." However, the court wondered whether such drugs would have the same effect on an addict as a first-time user, but again, "there was no evidence or testimony concerning that." The court then observed that "it did not appear to [Officer Petty] that [Brandt] was under the influence of heroin or fentanyl at the time he spoke with her."

¶ 27    The court noted that "[Brandt] said she was hit in the right side of the head with the glass, and *** a photograph [shows] an injury to the upper right portion of her head, which *** could be caused by glass." The court also observed that King's and Calli's testimony was contradictory. King testified that there was no glass on the floor while Brandt and Calli were fighting, yet she (and Calli) also testified that defendant's foot was cut by glass. The court asked "how that all works" in King's testimony. Also, contrary to King's testimony, Calli testified that Brandt broke glass tables during their fight and caused glass to shatter all over the floor. Moreover, Calli testified that Brandt was angry at defendant yet attacked Calli. Again, the court commented that "there was no explanation as to why."

¶ 28    The court found "that without question *** the most consistent witness who testified was [Brandt]." Although the defense attempted to impeach Brandt with her prior statement to the police, "her testimony compared to her statement were [*sic*] remarkably consistent." The court recalled that Brandt admitted that she wrote in her statement that " 'they' " broke down the front

door and broke the windows.[3] The court noted that, when confronted with her statement, Brandt was "very candid" in admitting that she "didn't see who did it" because "[i]t came from outside." The court also found Brandt "very candid about her heroin and fentanyl use" and noted that her testimony about the attack "was corroborated with photographs." Given everything, the court found Brandt's "testimony to be credible."

¶ 29    The court found defendant guilty. Defendant was sentenced, and this timely appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31    At issue in this appeal is whether the State proved defendant guilty beyond a reasonable doubt. The test on appeal for assessing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt. *People v. Lloyd*, 2013 IL 113510, ¶ 42. The trier of fact is best equipped to judge the credibility of the witnesses. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). Thus, the trier of fact's credibility findings are entitled to great weight. *Id.* at 115. The testimony of a single witness, if credible, is sufficient to convict. *People v. Kiertowicz*, 2013 IL App (1st) 123271, ¶ 19. We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 32    Defendant argues that the evidence was insufficient to prove him guilty of domestic battery beyond a reasonable doubt. As relevant here, to prove defendant guilty of domestic battery, the

---

[3]In fact, Brandt was not asked if she said anything in her statement about the door being broken down.

State had to prove beyond a reasonable doubt that defendant (1) caused bodily harm to or made physical contact of an insulting or provoking nature with (2) a family or household member. 720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2020).

¶ 33    Defendant claims that he was not proved guilty of domestic battery beyond a reasonable doubt because (1) the State's evidence was based on the uncorroborated and inconsistent testimony of Brandt, who admitted having ingested heroin and fentanyl four hours before the incident and (2) the evidence was insufficient to establish that he was a "household member" of Brandt's. See *id.* § 12-0.1. We address each issue in turn.

¶ 34                              A. Brandt's Credibility

¶ 35    Instructive on the issue of Brandt's credibility is *People v. Gray*, 2017 IL 120958. There, following a jury trial, the defendant was convicted of aggravated domestic battery. *Id.* ¶ 1. The victim, the defendant's ex-girlfriend, testified about the incident, admitting that she " 'still was drunk' " or " 'kind of drunk' " when she was attacked by the defendant. *Id.* ¶ 8. On appeal, the defendant argued that he was not proved guilty beyond a reasonable doubt because the victim's " 'level of intoxication alone eviscerates [her] credibility.' " *Id.* ¶ 34. Our supreme court disagreed. *Id.* ¶ 38. After noting that the defendant corroborated some of the details to which the victim testified, the court noted:

> "Evidence that a witness was drinking near the time of an event about which she testifies is probative of the witness's sensory capacity [citation] and affects the weight to be given her testimony [citation]. However, the fact that a witness had been drinking alcohol or was drunk does not necessarily preclude the trier of fact from finding the witness credible. [Citations.]

Here, the jury was well aware of the amount of alcohol [the victim] had consumed at [the] defendant's apartment and that she was still drunk at 7 a.m. The assessment of [the victim's] credibility was properly a question for the jury, which had the opportunity to view her testimony first hand at trial." *Id.* ¶¶ 40-41.

¶ 36    Here, too, although the evidence indicated that Brandt had ingested some potent drugs four hours before the incident, that fact alone does not mean that her testimony was incredible. This is especially true where, for example, no evidence indicated how much heroin and fentanyl were in the one or two bags Brandt ingested, how pure those drugs were, how frequent was Brandt's past ingestion of such drugs, and whether and to what extent she had developed a tolerance to such drugs. Brandt testified that the drugs she ingested did not "at all affect [her] memory of what happened that night." Also, Officer Petty, who described Brandt's demeanor when he arrived shortly after the incident, testified that he had no reason to believe that she was under the influence of heroin or fentanyl.

¶ 37    Both here and in *Gray*, the trier of fact was aware of the victim's use of substances and was able to observe her testimony. Here, the trial court, as the trier of fact, was well aware that Brandt had ingested heroin and fentanyl approximately four hours before the incident. Nonetheless, the court, having observed her testimony, found Brandt credible. We cannot conclude that that assessment was wrong, especially considering the court's assessment of what it accurately deemed as defendant's conflicting and improbable evidence. We simply cannot reverse defendant's conviction based solely on his claim that Brandt was incredible. See *id.* ¶ 36 ("A conviction will not be reversed simply because *** the defendant claims that a witness was not credible.").

¶ 38    Citing *People v. Pellegrino*, 30 Ill. 2d 331 (1964), which our supreme court discussed in *Gray*, defendant argues that Brandt's testimony was so incredible that his convictions must be reversed. In *Pellegrino*, four witnesses testified about who murdered the victim. *Id.* at 333-34. Two eyewitnesses identified the defendant as the murderer while the other two witnesses intimated that it was another person. *Id.* at 334. The trial court found the defendant guilty, the defendant appealed, and our supreme court determined "the evidence of [the] defendant's participation in the [murder] to be so unsatisfactory as to require a reversal of his conviction." *Id.* at 334-35. In reaching that conclusion, the court noted that one witness who identified the defendant at trial was traumatized at the time of the murder and accused two other people before finally indicating that the defendant was responsible. *Id.* at 334. Regarding the other eyewitness who identified the defendant, the court observed that she "was in the fourth week of a seven-week period of drunkenness at the time of the [murder]." *Id.* "Although she had not had a drink on [the evening of the murder], her prior drunkenness had affected her to the extent that she could not walk five feet without holding the wall and did not recognize [a] person, who was three feet away from her," around the time the murder occurred. *Id.*

¶ 39    The differences between this case and *Pellegrino* are obvious. Here, unlike the intoxicated witness in *Pellegrino*, nothing indicated that Brandt's consumption of heroin and fentanyl affected her ability to remember what happened on the morning of September 24, 2020. She, unlike the intoxicated witness in *Pellegrino*, was not detoxing or unable to recognize that defendant hit her with the glass insert. Indeed, as noted, Brandt testified that her consumption of heroin and fentanyl did not affect in the slightest her ability to remember what happened. Making this case even stronger than *Pellegrino* is the fact that Officer Petty did not even suspect that Brandt was under the influence of heroin or fentanyl when he arrived at the scene.

¶ 40    Defendant also argues that Brandt was incredible because she testified that he "smashed a thick glass table top [*sic*] over her head, yet she suffered no significant head injury, [which] was wildly improbable, unconvincing, and contrary to human experience." We disagree. The evidence revealed that Brandt sustained an injury to the part of her head where she said defendant hit her with the glass insert. The injury was potentially serious enough that the medical professionals at Good Shepherd Hospital ordered a CT scan. Further, as the State observes, "there was not testimony how hard defendant actually hit Brandt *** or how old or brittle the glass might have been." Indeed, it is possible that, although the glass insert shattered, defendant did not hit Brandt with great force, as he would not have wanted to risk injuring Calli with shattered glass.

¶ 41    Defendant also argues that, in finding Brandt credible, the trial court "improperly considered her written statement to police," which was not admitted into evidence. The record does not support this claim. "On review of a bench trial, we presume that the trial judge considered only properly admitted evidence unless the record affirmatively rebuts that presumption." *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 261. Brandt's statement was digitized and presented to her via a computer for purposes of impeachment. Before the court issued its ruling, it gathered the photographs and superseding information. The court said nothing about taking the digitized statement to consider it further. We conclude that the court did not consider Brandt's statement as substantive evidence.

¶ 42    Finally, defendant suggests that, in finding Brandt credible, the court considered the inconsistencies between King's and Calli's testimony. Defendant argues that, "[i]f the court considered some of the other witness testimony to be inconsistent, that inconsistency in no way renders Brandt's testimony more credible." However, nothing in the court's ruling suggests that the court found Brandt credible only because King and Calli were not. Rather, in finding defendant

guilty, the court merely noted that Brandt's testimony was consistent with the photographs and that the testimony of defense witnesses King and Calli was conflicting. Nothing about that was improper. See *People v. Droskiewcz*, 64 Ill. App. 3d 69, 74 (1978) ("Although, in the present case, the State's and defense's recounting of events are in sharp conflict, the trial judge explicitly stated that he found the State's witnesses credible, and believed that [the] defendant struck the first physical blow.").

¶ 43                          B. Household Member

¶ 44    We now consider whether the State established beyond a reasonable doubt that defendant was a "household member" of Brandt's. In addressing this issue, we note that the trial court never explicitly found that defendant was a "household member" of Brandt's. This does not mean that the court made no such finding. "[W]hen a trial court fails to make detailed findings of fact, *** this court must presume the trial court found all issues and controverted facts in favor of the prevailing party." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill. App. 3d 585, 596 (2008).

¶ 45    To be convicted of domestic battery the State must prove beyond a reasonable doubt that the victim was a "family or household member." 720 ILCS 5/12-3.2(a) (West 2020). Section 12-0.1 of the Criminal Code of 2012 (*id.* § 12-0.1) provides, in relevant part, that " '[f]amily or household members' include[s] *** persons who share or formerly shared a common dwelling."

¶ 46    Our supreme court has recognized that the legislature defined "household member" broadly to include all the many different types of cohabitation and shared-living arrangements. *People v. Almore*, 241 Ill. 2d 387, 396 (2011) (interpreting the same definition of " '[f]amily or household members' " contained in section 112A-3(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/112A-3(3) (West 2010))). "There can be no bright-line test for determining household

- 14 -

membership." *Almore*, 241 Ill. 2d at 396. Rather, "[e]ach case must be decided based on its specific facts." *Id.*

¶ 47     That said, sharing a common dwelling has been defined as " 'stay[ing] in one place together on an extended, indefinite, or regular basis.' " *People v. Bryant*, 2021 IL App (3d) 190530, ¶ 14 (quoting *People v. Young*, 362 Ill. App. 3d 843, 849 (2005)). Factors to consider in determining whether parties shared a common dwelling include, but are not limited to, (1) the length of time the parties lived together, (2) the nature of their living arrangements, (3) whether the parties had other living accommodations, (4) whether the parties kept personal items at the shared home, and (5) whether the parties shared in both the privileges and duties of having a common home, such as contributing to household expenses and helping with maintenance. *Id.*

¶ 48     Here, considering these factors and the evidence in a light most favorable to the State, as we must (*Lloyd*, 2013 IL 113510, ¶ 42), we determine that the evidence was sufficient to prove beyond a reasonable doubt that defendant was a household member. Brandt testified that defendant had lived with her for a month before the incident. He brought along his personal belongings, such as clothes, bedding, and towels. He helped with household chores, such as cleaning, grocery shopping, and cooking. He also set up an Internet-service account for the home in his name. Such facts are sufficient to establish that defendant and Brandt shared a common dwelling. See, *e.g.*, *Almore*, 241 Ill. 2d at 397 (the victim and the defendant shared a common dwelling where the victim and his mother (the defendant's girlfriend) stayed with the defendant in his temporary residence for five consecutive days before the incident, the victim had clothes in the home, and the defendant babysat the victim); *Bryant*, 2021 IL App (3d) 190530, ¶¶ 4, 16 (the victim, the grandson of the woman with whom the defendant had a sexual relationship, shared a common dwelling with

the defendant where, among other things, the defendant lived in the home, if for only a "few days" before the incident, kept personal belongings there, and paid for groceries).

¶ 49    Other evidence strengthens the conclusion that defendant lived with Brandt in her home on September 24, 2020. Calli had been to Brandt's house almost daily in the approximately three years that she had known Brandt, and Calli received mail at the house. Calli and defendant were close. Defendant drove Calli to Brandt's on September 23, 2020, and defendant, not King, came to Calli's defense when she and Brandt were fighting. At the time King lived with Brandt, King and defendant were dating. Defendant, Calli, and King frequently hung out together, and it was not unusual for them to be together in the very early morning hours.

¶ 50    Citing the facts that (1) defendant did not have a key to Brandt's home and (2) the "details surrounding the circumstances of the alleged [Internet] account" were not presented, defendant argues that the State failed to establish beyond a reasonable doubt that he and Brandt shared a common dwelling. We disagree. The fact that defendant did not have a key to Brandt's home is not dispositive. King testified that she did not have a key to Brandt's home even though she lived there for two months. Moreover, there was no evidence that Brandt herself had a key or used a key to enter her home. Similarly, nothing required the State to present anything other than Brandt's testimony to establish that defendant set up Internet service for the home. Considering the evidence presented, the trier of fact could have found defendant to be a household member.

¶ 51                                    III. CONCLUSION

¶ 52    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 53    Affirmed.

2022 IL App (2d) 210309

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 20-CM-1138; the Hon. Michael W. Feetterer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and R. Christopher White, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Richard S. London, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |