2023 IL App (2d) 230010-U
No. 2-23-0010
Order filed September 19, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-DV-399 |
| ELDRIDGE BROWN III, | ) ) ) | Honorable Charles D. Johnson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proved guilty of domestic battery where (1) despite defendant's various attacks on the victim's credibility, the evidence showed that defendant inflicted bodily harm on the victim and (2) defendant and the victim were household members, as both had been living for an extended time in the third party's residence where the incident occurred.

¶ 2    Following a bench trial, defendant, Eldridge Brown III, was convicted of two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2020)). The trial court subsequently vacated defendant's conviction of domestic battery based on physical contact of an insulting or provoking nature (see *id.* § 12-3.2(a)(2)) and sentenced defendant to six months in jail on the

remaining conviction of domestic battery based on bodily harm (see *id.* § 12-3.2(a)(1)). On appeal, defendant argues that (1) he was not proved guilty beyond a reasonable doubt of even simple battery based on bodily harm because the testimony of the victim, Kelly Richardson, about the incident was inconsistent and conflicted with other evidence; and, alternatively, (2) the State did not establish that he and Richardson were family or household members, and, therefore, we should reduce his conviction to one of simple battery (see *id.* § 12-3). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State's evidence at the November 3, 2022, bench trial revealed that Joe Parelis owned a four or five-bedroom house at 507 Lake Street in Waukegan (Waukegan home). Parelis wanted to remodel the house, so he retained defendant to do the work. In exchange for that work, Parelis allowed defendant to stay in the home. Defendant slept in a room on the first floor. Parelis stayed in a room on the second floor.

¶ 5      Richardson, Parelis's girlfriend, testified that she had been living in the Waukegan home for about two months as of the trial date. When asked specifically whether she was living in the Waukegan home on September 15, 2022, the date of the incident, she said yes. When defense counsel further questioned Richardson about where she lived on September 15, 2022, the following exchange was had:

"Q. *** [Y]ou had mentioned that you lived at [the Waukegan home] on September 15th of 2022; is that right?

A. Yes.

Q. But, Ms. Richardson, that's not true; is it?

A. Yes.

Q. It is true?

A. Yes, it is.

Q. Ms. Richardson, you lived in Beach Park at that time; didn't you?

A. Yes.

Q. You lived in Beach—

A. For—

Q. —Park?

A. For a while I did. Then I moved to—moved in with [Parelis].

Q. To be clear; on September 15th of 2022, you lived at Beach Park; didn't you?

A. No."

¶ 6    Richardson admitted that she told officers on the date of the incident that she lived in Beach Park. She told them this because "[t]hat [was] where [her] mailing address [was]." Richardson also testified that she kept some clothes in the Waukegan home and had a bedroom on the second floor. Because of remodeling in her bedroom, she had no bed there and slept in Parelis's room. Although Richardson testified that she "didn't have any arguments" about defendant staying in the house while remodeling it, she also believed that "[defendant] was taking advantage of the situation." She was "a little upset" because defendant failed to complete various remodeling projects.

¶ 7    On the night of September 15, 2022, Richardson and defendant were in the Waukegan home. She was drinking vodka that night. She claimed she "wasn't drunk" but "had like a little buzz." (She admitted that, in 2015, she was convicted of aggravated driving while under the influence of alcohol.) At one point that night, Richardson and defendant talked in defendant's room. When defendant "started to get to be too much," Richardson went to Parelis's room to lie down. She watched television and fell asleep.

¶ 8    Later, defendant woke Richardson, advising her that she was not allowed in Parelis's room. Richardson insisted that she was allowed in the room and rolled over to go back to sleep. Defendant then "grabbed [Richardson's] wrist almost breaking it." Richardson "was begging [defendant] to let [her] go." Defendant released Richardson's wrist, grabbed the back of her neck, and threw her to the floor. Defendant began hitting Richardson's head against the floor. Defendant then dragged Richardson from Parelis's bedroom and "kicked" her down the wood stairs to the first floor. Richardson testified that she was in a lot of pain after defendant "kicked" her down the stairs. She explained that her head, back, sides, and arms hurt. She also testified that she felt "[s]cared half to death" of defendant.

¶ 9    Once Richardson was at the bottom of the stairs, defendant threw her into his room and called Parelis. Defendant asked Parelis if Richardson was allowed in his room. When the phone call ended, defendant exited his room, leaving his phone behind. Richardson grabbed defendant's phone and called 911.

¶ 10    A recording of the 911 call was admitted at trial. That recording revealed that Richardson ended the call before the 911 operator answered. The operator called the number back, Richardson answered the phone, and she talked to the operator. She sounded like she had been crying, as she was sniffling and attempting to catch her breath. She continued sniffling throughout the conversation. She also paused before answering many of the operator's questions. The operator began by asking Richardson if she had an emergency. She said that she did. When the operator asked her for details about the emergency, she said she could not tell him what was happening. Richardson told defendant, who could be heard in the background, that she was talking to her father. Richardson lied to defendant because she did not know what defendant would do if he knew she was speaking to a 911 operator. Nothing in the timbre of defendant's voice suggested that he

was angry or was demanding that Richardson end the call or return his phone. The operator asked Richardson if she could tell him where she was. She said she could not. She then said, as if talking to her father, that she was at the house she told him about. Richardson asked defendant for the address, defendant gave it to her, and she relayed it to the operator while still pretending he was her father. The operator asked Richardson if someone was there with her, and she said, "He's here." The operator asked her if she wanted to remain on the phone with him until the police arrived, and she said, "If you can, yeah." The operator then asked if she could give him defendant's name. She said she could not. Defendant left the room, and the 911 operator asked Richardson if she needed medical attention. Richardson, who sounded like she was about to cry, told the operator that her wrist was broken and her hip really hurt. She explained that she was sleeping in her boyfriend's bed when defendant removed her from the bed and "threw" her down the stairs. She told the operator that "we don't want him here at all, but he just won't leave." Richardson then told the operator that defendant had returned to the room, and she whispered, "Can you come, please help." The 911 operator told Richardson that the police were outside. Richardson then left the house, followed by defendant. She met and spoke with the police. About 15 to 20 minutes after the incident, the police photographed her injuries.

¶ 11    Waukegan police officer Jovany Padilla was one of the officers who arrived on the scene. He testified that Richardson was crying and looked distraught and unkempt. Padilla noticed a scratch on Richardson's elbow and "like some redness" on the back of her head. Padilla did not mention in his report the redness on Richardson's head. Padilla saw no injuries or discoloration on Richardson's wrist. Padilla stated that defendant "was really upset." He "sounded very angry" and "was demanding his phone back." Padilla saw no injuries to defendant.

¶ 12    Padilla testified that another officer photographed Richardson's injuries. These photographs were admitted at trial and showed yellow bruises on Richardson's back and right elbow; a scab on her right elbow that had been bleeding, leaving a three-inch streak of blood on Richardson's upper right arm; and small cuts on her right arm, one of which was surrounded by a small purplish-blue bruise. Richardson testified that all these injuries, except for the scab on her right elbow, were caused when defendant kicked her down the stairs. According to Richardson, the scab was "busted open" during the incident and began bleeding.

¶ 13    Padilla testified that, in his experience, bruises can look different depending on when the injury occurred. When asked if the bruises he has observed in responding to domestic abuse incidents have always appeared red, he replied, "Not always." Asked if, generally, "the [bruises] that were just caused are typically red," Padilla answered, "They can be." When defense counsel attempted to question Padilla further about the connection between the color of bruises and their age, the trial court sustained the State's objections.

¶ 14    The State rested. Defendant moved for a directed finding, arguing that the State failed to prove him guilty of (1) even simple battery because the injuries depicted in the photographs were too old to have been caused that night and (2) domestic battery because the evidence did not show that Richardson and defendant lived together in the Waukegan home on the date of the incident.

¶ 15    In denying the motion, the trial court found that Richardson "stated very clearly that she lived *** at [the Waukegan home], but she had an address in Beach Park at which she received mail." The court found that "[t]he two are not inconsistent," as "[s]he could receive mail at one address and live at a different address." The court also found that, aside from Richardson's bruises, there was "at the very least, *** still testimony about pain in the wrist and some blood on the

elbow." Thus, the court determined that, even if it disregarded the bruises, "there [was] sufficient evidence of bodily harm."

¶ 16    Defendant did not present any evidence.

¶ 17    The trial court found defendant guilty of both counts of domestic battery. The court reiterated that the evidence showed that Richardson lived in the Waukegan home with Parelis and defendant on the date of the incident. The court noted that Richardson's testimony that she lived in the Waukegan home on that date was corroborated by "her awareness of the [remodeling] either taking place or not taking place at that location." The court found immaterial the fact that Richardson received mail at another address. Regarding whether a battery occurred, the court noted that Padilla's claim about seeing redness on Richardson's head "has to be taken with a grain of salt," as he did not document it. Moreover, there was no evidence concerning how many stairs Richardson fell down, and the court "[could] not tell" whether the photographs showed "new bruising or old bruising." Nonetheless, after noting that the evidence was not clear as to the age of Richardson's bruises, the court found enough evidence of bodily harm.  Specifically, the court asserted:

> "But even, *** if the Court were to disregard bruises altogether and any testimony regarding bruises, there is still very clear injury to [Richardson's] right elbow, *** although it appears to have had injuries prior to that; and, as stated as nicely as possible, [Richardson] doesn't appear to be in the best physical condition that she could be; bruises and marks and so forth on her body; there is a very clear blood streak on the elbow."

¶ 18    Defendant moved for a new trial, arguing that the trial court erred in barring Padilla's testimony about the connection between the color of bruises and their age. The court denied the motion, holding that it did not err and that any error was harmless because there was sufficient

evidence of bodily harm apart from the bruises. Specifically, although the court had "some concerns about the bruises and how they could have been caused by the complained-of activity," the court determined that "even if [it] discount[ed] the bruising, there was still ample evidence in the form of *** a scab on [Richardson's] elbow *** that had been apparently partially torn away and there was fresh blood."

¶ 19 At sentencing, the trial court vacated the domestic battery conviction based on insulting or provoking contact. The court sentenced defendant on the domestic battery conviction based on bodily harm.

¶ 20 This timely appeal followed.

¶ 21          II. ANALYSIS

¶ 22 At issue in this appeal is whether the State proved defendant guilty beyond a reasonable doubt. "The test on appeal for assessing the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt." *People v. Pence*, 2022 IL App (2d) 210309, ¶ 31. "The trier of fact is best equipped to judge the credibility of the witnesses." *Id.* "Thus, the trier of fact's credibility findings are entitled to great weight." *Id.* "The testimony of a single witness, if credible, is sufficient to convict." *Id.* "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 23 Defendant argues that the evidence was insufficient to prove him guilty of domestic battery beyond a reasonable doubt. As relevant here, to prove defendant guilty of domestic battery, the State had to establish beyond a reasonable doubt that defendant (1) caused bodily harm to (2) "any family or household member[.]" 720 ILCS 5/12-3.2(a)(1) (West 2020).

¶ 24    Defendant claims that (1) he was not proved guilty beyond a reasonable doubt of even simple battery based on bodily harm because Richardson's testimony about the incident was inconsistent and conflicted with other evidence; and, alternatively, (2) the evidence was insufficient to establish that he and Richardson were "household members" (see *id.* § 12-0.1), and, therefore, we should reduce his domestic battery conviction to one of simple battery (see *id.* § 12-3). We address each issue in turn.

¶ 25    First, we consider whether the State proved beyond a reasonable doubt that defendant caused bodily harm to Richardson. The evidence, when viewed in the light most favorable to the State, established that defendant was angry at Richardson because she was sleeping in Parelis's room. When Richardson refused to leave that room, defendant grabbed her wrist, causing her pain. Defendant then grabbed Richardson by her neck, pulled her out of bed, and threw her on the floor. While Richardson was on the floor, defendant beat her head against the floor. Defendant then "kicked" Richardson down the stairs and dragged her into his room. Richardson sustained various visible injuries from the attack, including bruises, redness on her head, cuts on her arm, and an opened bleeding scab. In addition to these visible injuries, Richardson suffered pain to her head, back, sides, and arms. Given this evidence, we conclude that defendant was proved guilty beyond a reasonable doubt of domestic battery based on bodily harm.

¶ 26    In arguing that he was not proved guilty beyond a reasonable doubt of causing bodily harm, defendant cites various facts that he suggests "call[ ]into question the credibility of the entirety of" Richardson's testimony. Those facts are that (1) Richardson's bruises were old, (2) she refused medical attention when the police arrived, (3) the police saw no injury to her wrist, (4) she told the 911 operator that defendant "threw" her down the stairs but testified that she was "kicked," and

(5) she was motivated to have defendant removed from the home. We find that none of these facts diminished Richardson's credibility.

¶ 27    First, although there was no evidence on how to assess the age of bruises, we determine, like the trial court, that the injuries aside from the bruises—the cuts and bleeding scab on Richardson's arm, the redness on her head, and the physical pain she suffered—were sufficient to establish defendant's guilt beyond a reasonable doubt. Second, the fact that Richardson refused medical attention does not necessarily mean she did not need it. Third, defendant could have caused pain to Richardson's wrist without injuring her or could have caused a nonvisible injury such as a sprain. Fourth, there is no significant difference between Richardson's statement to the 911 operator that defendant "threw" her down the stairs and her testimony that defendant "kicked" her down the stairs. Fifth, Richardson's statement to the 911 operator that "we don't want him here at all, but he just won't leave" does not necessarily mean that she lied about defendant attacking her. In the context of the entire 911 call, Richardson could have meant that "we" did not want defendant in the house because of his recent abuse. Thus, none of the foregoing facts necessarily conflicts with Richardson's testimony or tarnishes her credibility. Viewing her testimony and the remaining evidence in the light most favorable to the State, we reiterate that defendant was proved guilty beyond a reasonable doubt of domestic battery based on bodily harm.

¶ 28    We now consider whether the State established beyond a reasonable doubt that defendant and Richardson were "household members." To prove domestic battery, the State must establish beyond a reasonable doubt that the defendant and the victim were "family or household member[s]." 720 ILCS 5/12-3.2(a)(1) (West 2020). Section 12-0.1 of the Criminal Code of 2012 (*id.* § 12-0.1) provides, in relevant part, that " '[f]amily or household members' include[s] *** persons who share or formerly shared a common dwelling[.]"

¶ 29   "Our supreme court has recognized that the legislature defined 'household member' broadly to include all the many different types of cohabitation and shared-living arrangements." *Pence*, 2022 IL App (2d) 210309, ¶ 46 (citing *People v. Almore*, 241 Ill. 2d 387, 396 (2011) (interpreting the same definition of " '[f]amily or household members' " contained in section 112A-3(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/112A-3(3) (West 2010))). " 'There can be no bright-line test for determining household membership.' " *Pence*, 2022 IL App (2d) 210309, ¶ 46 (quoting *Almore*, 241 Ill. 2d at 396). "Rather, '[e]ach case must be decided based on its specific facts.' " *Id.* (quoting *Almore*, 241 Ill. 2d at 396). "That said, sharing a common dwelling has been defined as stay[ing] in one place together on an extended, indefinite, or regular basis." (Internal quotation marks omitted.) *Id. ¶* 47.

> "Factors to consider in determining whether parties shared a common dwelling include, but are not limited to, (1) the length of time the parties lived together, (2) the nature of their living arrangements, (3) whether the parties had other living accommodations, (4) whether the parties kept personal items at the shared home, and (5) whether the parties shared in both the privileges and duties of having a common home, such as contributing to household expenses and helping with maintenance." *Id.*

¶ 30   Here, considering these factors and the evidence in the light most favorable to the State, we determine that defendant and Richardson were household members. Although no evidence was presented concerning the length of time the parties lived together in the Waukegan home, Richardson indicated that she had been living there for about two months prior to trial, or since about September 3, 2022. This was approximately two weeks before the incident. The evidence revealed that defendant was allowed to stay in the home while remodeling it and that he had been there long enough for Richardson to become frustrated with his failure to complete various

remodeling projects. As the trial court noted, Richardson's familiarity with the status of the remodeling projects suggested that she lived in the house, observing which projects were being completed and which were not. Moreover, Richardson had lived in the house at least long enough to store some of her clothes there, and although she did not have a bed in the home, this was only because her bedroom was under construction. Parelis, the homeowner, allowed both Richardson, his girlfriend, and defendant, his contractor, to stay in the home. Although Richardson received mail at an address in Beach Park, she testified that she was living in the Waukegan home, not at the Beach Park address, on the date of the incident. While no evidence indicated what, if anything, Richardson did to help maintain the household, defendant was there because he was helping to maintain and fix the house.

¶ 31    In arguing that the evidence did not establish beyond a reasonable doubt that he and Richardson were household members, defendant asserts that Richardson testified that she lived in Beach Park on the date of the incident. Defendant overlooks the context of her testimony and the deference we owe the trial court as the fact finder. The trial court found that Richardson "stated very clearly that she lived *** at [the Waukegan home], but she had an address in Beach Park at which she received mail." We will not disturb the trial court's credibility judgments or its resolution of conflicts in the evidence. See *People v. Joya*, 319 Ill. App. 3d 370, 381 (2001). Richardson initially testified that she lived in Beach Park on the date of the incident, but then she quickly corrected herself and said that she lived in Beach Park before moving to the Waukegan home sometime before the date of the incident. Later in her testimony, she expressly reaffirmed that she lived in the Waukegan home on the date of the incident and merely received mail at the Beach Park address. Although she did acknowledge telling the police that she lived at the Beach Park address, she explained that she did so because she was receiving mail at that address.

¶ 32    We uphold the trial court's finding that Richardson "clearly" testified that she lived in the Waukegan home on the date of the incident. Also, as explained, the trial court properly concluded that Richardson and defendant were household members on the date of the incident. On that date, Richardson's only connection to the Beach Park address was that she received mail there. That fact did not by itself preclude a finding that defendant and Richardson were household members, especially given the other evidence that both of them had been staying in the Waukegan home for some time.

¶ 33                                III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 35    Affirmed.