2024 IL App (3d) 230358-U
No. 3-23-0358
Order filed July 5, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of La Salle County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CM-120 |
| ANGEL M. FARMER, | ) ) ) | Honorable H. Chris Ryan, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant was proved guilty of battery where the video and testimonial evidence established that she knowingly initiated physical contact of an insulting or provoking nature with a sheriff's deputy by pushing past him to enter a public building despite being told that she was not allowed in the building with her cell phone. (2) There was no one-act, one-crime violation where the battery count was based on defendant's pushing past the deputy to enter the building, while the obstructing a peace officer count was based on the separate act of disobeying the deputy's order to step away from the building's entrance.

¶ 2     Defendant, Angel M. Farmer, was charged with three counts of battery (720 ILCS 5/12-3(a)(1), (a)(2) (West 2020)) and one count of obstructing a peace officer (*id.* § 31-1(a)).[1]  One of the battery counts (count III) alleged that defendant made physical contact of an insulting or provoking nature with La Salle County sheriff's deputy Kurt Pastirik on March 2, 2021.  The two other battery counts concerned defendant's encounter with La Salle County sheriff's deputy James Knoblauch on March 8, 2021.  Count I alleged that defendant caused bodily harm to Knoblauch, and count II alleged that defendant made physical contact of an insulting or provoking nature with him.  Like counts I and II, the obstructing a peace officer count (count IV) involved defendant's March 8, 2021, encounter with Knoblauch.  Following a jury trial, defendant was found guilty of counts II, III, and IV.  She was sentenced to 24 months of conditional discharge and 48 hours in jail, followed by 6 weekends in jail.  This timely appeal followed.  On appeal, defendant argues that (1) she was not proved guilty beyond a reasonable doubt of battering Pastirik (count III) and (2) her conviction of count II must be vacated based on a violation of the one-act, one-crime rule because the act that served as the basis for the battery of Knoblauch (count II) was the same act that formed the basis for obstructing a peace officer (count IV).  We affirm.

¶ 3                              I. BACKGROUND

¶ 4     The offenses at issue occurred in the La Salle County Criminal Justice Center.  The Criminal Justice Center housed courtrooms, the La Salle County Sheriff's Department, and the 911 call center.  The main entrance door was about two feet wide.  Inside the door was a vestibule, beyond which was a metal detector.

---

[1]By supreme court order (Ill. S. Ct., M.R. 1024 (eff. Aug. 14, 2023)), this appeal was transferred from the Third District to the Second District.

¶ 5    In 2007, signs around the Criminal Justice Center warned the public that cell phones were prohibited in the building. In March 2021, access to the building was limited because of COVID-19. The main entrance was locked, and before being admitted into the building, patrons had to successfully complete a COVID-19 screening.

¶ 6    La Salle County sheriff's deputies Donna Ortiz, Lou Riva, Pastirik, and Knoblauch worked in the Criminal Justice Center. Deputies who worked there wore blue blazers, dress shirts, ties, pants, and dress shoes. Visible on the blazers were badge insignias. Deputies were also armed with guns and carried handcuffs.

¶ 7                          A. The March 2, 2021, Battery of Pastirik

¶ 8    Count III alleged:

"On or about March 2, 2021, *** defendant *** committed the offense of:

    "*Battery* *** in that said defendant knowingly and without legal justification[ ] made physical contact of an insulting and provoking nature with *** Pastirik, in that *** defendant pushed *** Pastirik about the body[.]" (Emphasis added.)

¶ 9    At trial, Ortiz testified that she was monitoring the metal detector at the Criminal Justice Center on March 2, 2021. Around noon, she saw defendant (who called herself "[A]ccountability [A]ngel") and her brother, Jacob Farmer (who called himself "Justice Jake"), walking toward the main entrance. Ortiz knew defendant, as she had often visited the Criminal Justice Center. Ortiz described her encounters with defendant as "exhausting." On previous occasions, defendant belittled Ortiz. She told her that Ortiz's father died because Ortiz embarrassed him and that Ortiz failed to uphold her oath. Defendant also threatened to sue Ortiz.

¶ 10    When defendant and Jacob got to the main entrance, Ortiz saw that defendant had her cell phone mounted on a stick. Defendant knocked on the door. Ortiz propped the door open and

asked what they wanted. Jacob, who was argumentative and did not want to complete any COVID-19 screening, told Ortiz they wanted to go to the sheriff's office to turn in a complaint. The pair entered the vestibule. Soon thereafter, Ortiz left the area to escort a woman to jail.

¶ 11    Pastirik testified that he had worked as a law enforcement officer for 35 years before becoming a sheriff's deputy with La Salle County. He confirmed that defendant and Jacob approached the Criminal Justice Center around noon on March 2, 2021. Ortiz greeted them at the door to begin the COVID-19 screening process. Pastirik moved to the metal detector. Defendant and Jacob were reminded that cell phones were prohibited in the building. The pair began arguing about their constitutional right to have a cell phone in the building. Jacob gave his cell phone to defendant and was eventually allowed to proceed to the sheriff's office. Defendant, who remained between the entrance door and the metal detector, recorded what transpired.

¶ 12    Between defendant and Pastirik was a chain prohibiting access to the metal detector. Defendant unhooked the chain twice, and each time, Pastirik replaced it, advising defendant that she could not enter with a cell phone. Pastirik then stood in front of the metal detector, facing the inside of the building. As Pastirik stood in this position, he "felt [defendant] check—body check [him] and come through th[e] area where [he] was blocking." Pastirik explained that defendant proceeded through the metal detector on his right side, "[t]hrough [him]." He stated that this contact made him feel "[p]rovoked, insulted, [and] intimidated."

¶ 13    Pastirik testified that, after defendant went through the metal detector, he "backed off" because he did not want the situation to "get further out of control." Although he had the authority to arrest defendant, he did not do so because he needed to prevent the situation from escalating. When Ortiz returned, she arrested defendant.

¶ 14    Defendant testified that she is an independent journalist with an online presence. She posts information on her YouTube channel to promote transparency and accountability of government agencies. On March 2, 2021, she entered the building and stood between the entrance door and the metal detector. Pastirik was in front of her. She told Pastirik to "move" because she was "trying to get a good shot." Pastirik shrugged his shoulders and told defendant that "[s]he did" already. Defendant "sized *** up" the situation and then "swooped through" the metal detector. Defendant stated that Pastirik was immediately "all up on [her]" and kicked his feet out toward her. Defendant yelled at Pastirik not to touch or come near her unless he was going to arrest her. While this was happening, Pastirik repeatedly told defendant she could not enter the building with her cell phone.

¶ 15    Two recordings of the March 2, 2021, incident were admitted at trial. People's Exhibit 1 was recorded through a sliding glass window by an individual who worked in an office several yards away from the metal detector. The recording was shot face-on at the metal detector and the main entrance beyond it. People inside the office were talking as Jacob and defendant argued with a plainclothes deputy. Ortiz and Pastirik were standing alongside the plainclothes deputy. Defendant was filming what was transpiring. Jacob, who was allowed to enter, walked up to the office where the recording was being made. He started arguing with an employee about the policy prohibiting cell phones in the building. Ortiz and the plainclothes deputy left the area. Defendant continued recording what was transpiring in the building. Twice, she unhooked the chain that barred passage through an entryway next to the metal detector. That entryway was also blocked with an orange construction cone. Pastirik replaced the chain each time. Pastirik then positioned himself slightly to the left in front of the metal detector. His back was mostly to defendant as he stood at a 45-degree angle to the right. Defendant then stepped to the right of Pastirik. Pastirik

extended his right leg to stop defendant. He then stumbled forward as defendant made her way through the metal detector.

¶ 16    People's Exhibit 2 was taken from a surveillance camera positioned several yards to the right of the metal detector. It showed defendant filming what transpired in the building and unhooking the chain next to the metal detector. It also showed Pastirik replacing the chain and standing in front of the metal detector. As Pastirik stood in front of the metal detector, defendant turned to the right and stepped through the metal detector. Pastirik was pushed several feet forward as defendant came through the metal detector. Once past the metal detector, defendant continued recording with her cell phone.

¶ 17               B. The March 8, 2021, Battery and Obstruction of Knoblauch

¶ 18    Count II alleged:

"On or about March 8, 2021, *** defendant, *** committed the offense of:

    *Battery* *** in that *** defendant *** knowingly and without legal justification[ ] made physical contact of an insulting and provoking nature with *** Knoblauch, in that *** defendant made physical contact with and forcibly pushed against the body of *** Knoblauch with her body and hip." (Emphasis in original.)

¶ 19    Count IV alleged:

"On or about March 8, 2021, *** defendant *** committed the offense of:

    *Obstructing a peace officer* *** in that *** defendant knowingly obstructed the performance of *** Knoblauch of an authorized act within his official capacity, being preventing unauthorized entry into the LaSalle County Criminal Justice Center by an individual not complying with security mandates, knowing *** Knoblauch to be a peace officer engaged in the execution of his official duties, in that the defendant after having

been given a lawful order to step back from the entryway, refused to obey that order and physically pushed *** Knoblauch in an attempt to forcibly gain entry into the courthouse[.]" (Emphasis in original.)

¶ 20 In its opening statement at trial, the State advised the jury that it would review a recording of the March 8, 2021, incident and see defendant "aggressively pounding on the door demanding to be let in." The recording would also show that defendant "shove[d] her body in to [*sic*] *** Knoblauch preventing him from closing the door to the courthouse and trying to make her way past him in to [*sic*] this building."

¶ 21 Ortiz testified that around 1 p.m. on March 8, 2021, she was working with Knoblauch and Riva. Defendant and Jacob approached the Criminal Justice Center and started banging on the main entrance door. Knoblauch approached the door. Jacob, who indicated that the pair wanted to go to the sheriff's office, was allowed to enter the building after he gave his cell phone to defendant and completed a COVID-19 screening. Defendant remained outside, pounding on the door and recording what transpired inside.

¶ 22 Ortiz stated that, while this was happening, another citizen, Jason Shawback[2], approached the building. Knoblauch opened the door, waving Shawback inside. Knoblauch then positioned himself in the doorway. He put his left hand behind his back, placed his right hand on the door to brace himself, and positioned his legs in a wide stance. This blocked defendant's entrance into the building. Defendant continued recording while she was "leaning on to [*sic*] the door as well as *** Knoblauch." Jacob exited the building and joined defendant at the main entrance door. Knoblauch ordered defendant and Jacob to "step back and get out of his space." Neither defendant

---

[2]Defendant identified the citizen by name when he approached.

nor Jacob complied. Ortiz testified that there was "contact" between defendant and Knoblauch and that defendant initiated it. Ultimately, defendant and Jacob were arrested that day.

¶ 23 Riva testified consistently with Ortiz. He added that, when he saw defendant and Jacob approach the building with cell phones in their hands, he motioned to a sign warning that cell phones were prohibited in the building. Riva then told the pair they would have to put their cell phones in their car. They refused. Riva learned that defendant had complaint forms to drop off, and he offered to have another deputy do that for her. Defendant refused, advising Riva that she had the right to turn them in herself. Jacob, too, declined to turn in the forms for defendant because he believed defendant should be allowed to do so herself.

¶ 24 Riva stated that, when Knoblauch attempted to close the door after Shawback entered, defendant put her butt in the way, preventing Knoblauch from closing it. Knoblauch ordered defendant to back up. Defendant refused. Riva, who was standing right behind Knoblauch, stated that "[Knoblauch] [was] getting bumped in to [*sic*] as [defendant] [was] attempting to push past him." Riva explained that "[defendant] ke[pt] thrusting her hip in to [*sic*] [Knoblauch]." Although defendant yelled at Knoblauch to stop pushing her, Riva explained that "in fact *** [he] [could] see [Knoblauch's] left arm [wa]s behind [h]is back th[e] entire time." Riva characterized as "false" defendant's claim that Knoblauch touched her.

¶ 25 Knoblauch, a police officer for 30 years before becoming a LaSalle County deputy sheriff, testified consistently with Ortiz and Riva. He added that he tried to close the door after he allowed Shawback to enter the building. However, "defendant put her weight [on] the door and [Knoblauch's] body[,] holding it open." Knoblauch put his left arm behind his back and placed his right arm across the door, holding it firmly because defendant continued pushing. Knoblauch stated that he felt violated and insulted because defendant claimed that he initiated contact with

her. Knoblauch stated that "[defendant] was making contact with [him,]" as he "was just trying to close the door and do [his] job." As defendant continued pushing, Knoblauch ordered defendant "numerous times" to "step back" so he could secure the door. Defendant disobeyed this order. Knoblauch called for assistance, and defendant and Jacob were arrested.

¶ 26 Like Ortiz, Knoblauch had encountered defendant previously. He described his prior encounters with her as "not as bad."

¶ 27 Defendant testified that on March 8, 2021, Knoblauch touched her first. She yelled at him, "Don't touch me[.]" Knoblauch responded, "I'm not." Defendant denied that Knoblauch ever told her to step away from the door.

¶ 28 Defendant stated that she was confused and frightened when arrested. However, her mugshot, which was admitted into evidence, showed defendant smiling and giving a peace sign.

¶ 29 Defendant admitted that she posts the recordings that she takes. She claimed that they are all positive. Yet, she admitted that the recordings she posted had such titles as "[N]o name Jim Knoblauch is a tyrant scum" and "LaSalle county oath breaking thugs are going down." She also posted a photograph of Knoblauch with a "message bubble" next to it that said "I abuse women and then fake injuries to cover my crimes."

¶ 30 Three recordings of the March 8, 2021, incident were admitted at trial. They showed, among other things, Jacob and defendant banging on the door to be let in. When asked what business they needed to conduct inside the Criminal Justice Center, defendant said that she had a complaint form to turn in. She said, "We're trying to get in at any cost." Soon thereafter, Knoblauch approached the entrance door. As he did, defendant yelled, "No name. Grow some balls. Come on. Come get my complaint." When Shawback was at the door, Knoblauch opened it. Shawback squeezed behind Knoblauch as Knoblauch blocked defendant from entering.

Defendant then used her backside to try and push herself inside. As she did, she said, "Excuse me." She also stated, "Get your body off me, Jim," and "don't touch me." Knoblauch asserted, "I'm not." Defendant threatened Knoblauch, saying that he would be charged if he continued touching her. Knoblauch asked, "For what?" Someone in the background responded, "Disobeying a police officer." Defendant then encouraged Knoblauch to arrest her and threatened to have Knoblauch arrested for false arrest if he did. As defendant continued to push against Knoblauch, she yelled various vulgarities, demanding at one point that the other deputies "get one of those motherf***. He's putting his hands on me." Knoblauch advised defendant that he was not touching her, as his arm was behind his back. The recordings showed Knoblauch's right arm bracing the door and his left arm behind his back. Knoblauch continued ordering defendant to "step back." Defendant did not do so. After Jacob exited the building and reapproached, Knoblauch ordered the pair numerous times to "please step back from my space," and he called for assistance. Jacob mocked Knoblauch, and the pair disobeyed the order and used vulgarities. Other officers eventually arrested defendant.

¶ 31 In closing, the State went through all the counts brought against defendant. Regarding the alleged battery of Knoblauch (counts I and II), the State delineated the elements of battery that the jury was to consider. After noting that count I alleged bodily harm, the State said:

> "There's an additional insulting and provoking count [*i.e.*, count II]. Was it insulting and provoking when [defendant's] banging in to [*sic*] [Knoblauch] and not letting him call and accusing him of grabbing her? Was that insulting? He told you it was. Was it provoking? Clearly. How do you know it was provoking because he called for help. Where are they at? It's time. He's provoked. He called for help."

¶ 32    Similarly, concerning the obstruction of a peace officer count (count IV), the State delineated the elements of the offense that the jury had to consider and then argued:

"[Knoblauch was] trying to shut the door. [He's] trying to secure it. Come on. Of course she [knowingly] obstructed [Knoblauch]. How many times did he ask? How many times could he ask? I can tell you it doesn't matter. [Defendant and Jacob] flat out said you can ask all you want. It's not going to happen."

¶ 33    The jury found defendant not guilty of count I and guilty of counts II, III, and IV. Defendant moved for a mistrial because she thought an assistant state's attorney walked in on the jury during deliberation. The trial court denied the motion, noting that the attorney who walked in was an assistant public defender.

¶ 34    Defendant was sentenced, and this timely appeal followed.

¶ 35                                II. ANALYSIS

¶ 36    On appeal, defendant argues that (1) she was not proved guilty beyond a reasonable doubt of battering Pastirik (count III) and (2) her conviction of count II must be vacated based on a violation of the one-act, one-crime rule because the act that served as the basis for the battery of Knoblauch (count II) was the same act that formed the basis for obstructing a peace officer (count IV). We consider each issue in turn.

¶ 37            A. Sufficiency of the Evidence – Battery of Pastirik on March 2, 2021

¶ 38    Defendant argues that she was not proved guilty beyond a reasonable doubt of battering Pastirik on March 2, 2021. The relevant question for us is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the responsibility of the trier of fact, the jury here, to resolve

conflicts in the testimony, weigh evidence, and draw reasonable inferences from the facts. *People v. Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the jury on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 39 To prove defendant guilty of battery here, the State had to establish beyond a reasonable doubt that defendant (1) knowingly and (2) without legal justification (3) made physical contact of an insulting or provoking nature with Pastirik. See 720 ILCS 5/12-3(a)(2) (West 2020). Defendant does not advance any argument that her actions were legally justified. Rather, she argues that she (1) did not initiate physical contact with Pastirik. She contends that even if she did, she (2) did not act knowingly. She then claims that if she knowingly made physical contact with Pastirik, that contact was not (3) insulting or provoking in nature. We disagree.

¶ 40 First, we determine that defendant initiated physical contact with Pastirik. Despite having notice that cell phones were prohibited in the building, defendant brought hers inside and recorded with it. She admitted that she ordered Pastirik to "move" so that she could have a better view for her recording. Pastirik, who did not acquiesce, stood on the other side of the metal detector and faced partly away from defendant. Defendant then "body check[ed]" Pastirik and forced herself "through" him.

¶ 41 Citing the relevant recordings admitted at trial, defendant contends, as she testified at trial, that Pastirik initiated physical contact with her. Although People's Exhibit 1 (the recording taken face-on by an employee working in the Criminal Justice Center) does not clearly show that defendant initiated physical contact with Pastirik, People's Exhibit 2 (the surveillance recording

taken from the side) clearly does. People's Exhibit 2 showed defendant moving Pastirik several feet forward as she pushed herself through the metal detector and further inside the building.

¶ 42 Defendant's argument amounts to nothing more than a request that we reweigh and reevaluate the evidence to favor her. As noted, resolving any conflicts in the evidence and weighing any inconsistencies were within the jury's province. *People v. Hernandez*, 319 Ill. App. 3d 520, 533 (2001); *People v. Hruza*, 312 Ill. App. 3d 319, 325 (2000). We will not reweigh the evidence, as it is not our function to retry defendant. See *People v. Patterson*, 314 Ill. App. 3d 962, 969 (2000). Viewing all the evidence, including the recordings, in the light most favorable to the State, we determine that defendant was proved guilty beyond a reasonable doubt of making physical contact with Pastirik.

¶ 43 Second, we determine that defendant acted knowingly. "A person knows, or acts knowingly or with knowledge of: *** [t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2020). "When the law provides that acting knowingly suffices to establish an element of an offense, that element also is established if a person acts intentionally." *Id.* "Where [the] defendant denies intent, the State may prove [the] defendant's knowledge through circumstantial evidence." *People v. Ford*, 2015 IL App (3d) 130810, ¶ 38. Thus, "[i]ntent may be proved by a defendant's conduct surrounding the act and from the act itself." *Id.* "A defendant need not intend the particular injury or consequence that resulted from his conduct" to act knowingly. *Id.*

¶ 44 Here, the evidence revealed that defendant had a very negative view of the deputies working in the Criminal Justice Center. Not only did she post negative things about them online, but she recorded what they were doing, belittled them, swore at them, and threatened to sue them

while they were doing nothing but their jobs. Similarly, only six days after her encounter with Pastirik, she battered Knoblauch, stating beforehand that she would "get in [the building] at any cost." On March 2, 2021, defendant was allowed into the vestibule with her cell phone. It was then made clear to her that she would not be allowed to go further into the building with the cell phone, a fact she knew from the signs posted around the building and her previous encounters with La Salle County deputies. Nonetheless, while standing in front of Pastirik with her cell phone, defendant twice attempted to go further into the building by unfastening the chain prohibiting access into the building. Pastirik replaced the chain, defendant unfastened it again, and Pastirik replaced it again. After this, he stood in front of the metal detector with his back mostly toward defendant. At that point, defendant, undeterred, pushed herself "through" Pastirik, moving Pastirik several feet forward.

¶ 45    Defendant argues that she did not act knowingly because "her intent in walking through the metal detector was to turn in her complaint form." She continues that, "[i]n doing so, she made incidental contact with Pastirik, who *** initiated such contact when he tried to block her way." Thus, she argues that, "[t]o the extent this Court finds she did make first contact, it was accidental." We disagree.

¶ 46    Assuming that the complaint form was with defendant and not Jacob, we find defendant's argument unpersuasive. If, as defendant suggests, her intent was simply to turn in her complaint, there were many other avenues for her to accomplish that goal that would not have involved making physical contact with Pastirik in any way. For example, she could have had a deputy or Jacob turn it in. Even simpler, defendant could have put her cell phone in her car and, as she wished, turned the complaint in herself. Defendant, opting not to take any of these or similar approaches, chose instead to force her way inside, suggesting that she knew full well what she was

doing. Indeed, the recordings suggested or explicitly revealed that defendant—true to her word—would try to get into the building "at any cost." Once inside, defendant did not turn in her complaint form but, instead, continued to record what was going on. Viewing the evidence of what transpired in the light most favorable to the State, we determine that the State proved beyond a reasonable doubt that defendant knowingly made physical contact with Pastirik.

¶ 47  Defendant relies on *People v. Lee*, 2017 IL App (1st) 151652, to argue that she did not act knowingly. In *Lee*, the defendant, a diagnosed schizophrenic, was admitted to the hospital because he had suicidal thoughts and had intentionally overdosed on prescription medication. *Id.* ¶¶ 3, 10. Emily Reich, a nurse familiar with the defendant, told him that, for safety purposes, he had to remove his chain necklace, which had a cross on it. *Id.* ¶ 4. The defendant refused, called Reich vulgar names, and threatened to kill her. *Id.* When Reich attempted to remove the necklace, the defendant pulled away, breaking the chain. *Id.* Reich then saw the "defendant's 'elbow come down and his hand go back up,' which made Reich 'flinch.' " *Id.* Reich then felt something very sharp on her forehead. *Id.* She "realized" that the defendant had hit her with the cross he was holding. *Id.* Surveillance video of the incident showed the "defendant's hand briefly 'flutter[ing],' which was when Reich said [the] defendant hit her with the cross." *Id.* ¶ 6. The defendant "threw the cross onto the floor[,]" and Reich bent down to retrieve it. *Id.* ¶ 5. As she rose, the defendant stood over her and threatened to kill her. *Id.*

¶ 48  Katie Blazek, another nurse in the room, "saw [the] defendant's hand move 'in a very fast motion across the bed towards the opposite side of the bed.' " *Id.* ¶ 9. Blazek did not see the defendant hit or strike Reich, as her attention was focused on the defendant. *Id.*

¶ 49  The defendant testified that Reich attempted to steal his necklace. *Id.* ¶ 11. The necklace was a gift from his partner, who had been in a tragic accident with the defendant's son earlier in

the day. *Id.*¶ 10. The defendant's son did not survive. *Id.* The defendant knew, respected, and credited the hospital staff with saving his life numerous times. *Id.* The defendant denied ever striking Reich. *Id.* ¶ 11.

¶ 50 The trial court found the defendant guilty of aggravated battery. *Id.* ¶ 14. The court noted that, although "there was some disagreement in the testimony regarding what happened during the struggle for the cross, *** it had 'no difficulty' with Reich's testimony." *Id.* Thus, the court found "that [the] defendant intentionally struck Reich during the struggle." *Id.*

¶ 51 The appellate court reversed (*id.* ¶ 23), holding that the evidence, viewed in the light most favorable to the State, did not establish that defendant intended to batter Reich (*id.* ¶ 20). The court noted that knowingness may be proved by circumstantial evidence and inferred from the defendant's actions and the surrounding conduct. *Id.* ¶ 20. The court then observed that the defendant was in a distressed mental state when he was transported to the hospital. *Id.* ¶ 21. When Reich sought to remove his necklace, the defendant, who thought highly of the hospital staff, reacted inappropriately because of his mental state and sentimental attachment to the necklace. *Id.* Based on these facts, the court concluded that the defendant "inadvertently" struck Reich with the cross. *Id.* ¶ 21.

¶ 52 Defendant claims that *Lee* is persuasive here because it "underscores the importance of the State's burden of proving criminal intent beyond a reasonable doubt." While that may be true, we do not find *Lee* persuasive here. Unlike in *Lee*, where several facts indicated that the defendant did not act knowingly, there are no facts here to suggest likewise. Here, unlike in *Lee*, defendant was not under the influence of drugs or suffering from a mental illness when she battered Pastirik. Thus, her actions could not be deemed accidental because of a diminished mental capacity. Moreover, unlike the defendant in *Lee*, who valued the hospital staff, defendant here did not hold

the deputies in high regard at all. She belittled, insulted, and swore at the deputies while they were working and called them scum, abusers, and liars on her YouTube channel. Her lack of compassion and respect for the deputies, like Pastirik, suggests that she would not hesitate to physically push Pastirik to get what she wanted. Further, unlike in *Lee*, defendant here had the opportunity and means to accomplish what she wanted, *i.e.*, tendering her complaint form to the sheriff, without engaging in any type of confrontation. But, rather than take that type of approach, defendant chose to force her way inside the Criminal Justice Center while holding her cell phone, which she knew was prohibited. Last, unlike in *Lee*, where Reich "realized" she had been hit by the defendant's cross only after she felt pain, Pastirik made clear that he knew defendant was "body check[ing him]" so that she could "come through the area where [he] was blocking."

¶ 53    Third, defendant argues that the physical contact with Pastirik was not insulting or provoking. Our supreme court recently provided guidance in defining "insulting or provoking" contact. In *People v. Davidson*, 2023 IL 127538, ¶ 16, the court stated:

> "[W]hether the contact is insulting or provoking is an objective inquiry. The use of the noun 'nature' after the adjectives 'insulting' and 'provoking' [in section 12-3(a)(2) of the Criminal Code of 2012 (720 ILCS 5/12-3(a)(2) (West 2020))] means that those terms describe the requisite 'nature' of the contact, taking it outside the scope of the victim's subjective view. The plain meaning of 'nature' in this context reflects an intent to look outside the victim's viewpoint and to that of a reasonable person's perspective. Put another way, it is the nature of the contact, not the actual impact on the victim, that must be established. Consequently, we hold that the trier of fact is asked to determine whether a reasonable person under the circumstances would find the physical contact insulting or provoking in nature."

¶ 54    Here, aside from the fact that Pastirik testified that he was insulted and provoked, we determine that the physical contact defendant made with Pastirik was insulting or provoking. After defendant was told she could not enter the building with her cell phone, she attempted twice to do so and ordered Pastirik to "move" simply because she wanted a better angle for her recording. Then, when Pastirik ended the interaction between them by turning his back to defendant and standing in front of the metal detector, defendant persisted in getting inside the building by forcing herself "through" Pastirik. Defendant came through the metal detector with such force that Pastirik was pushed several feet forward. A reasonable person in Pastirik's position would feel insulted or provoked, not just by the physical contact but also by the willful violation of his repeated directive that cell phones were prohibited in the building. Viewing the evidence in the light most favorable to the State, we determine that defendant's physical contact with Pastirik was insulting or provoking.

¶ 55    Defendant argues that the surrounding circumstances indicate that the physical contact with Pastirik was not insulting or provoking. She claims this case involves " 'First Amendment audits' that [defendant] conducts as a self-described independent journalist." She notes that "[s]he records her interactions in public buildings to promote transparency and accountability and posts the videos on YouTube." She disagrees with "the State's contention *** that her goal is to generate 'clicks' or views" because "[n]othing in the record indicates that she financially benefitted from her work."

¶ 56    To the extent that any of these facts are relevant in assessing whether the physical contact was insulting or provoking, we disagree. Although defendant's goals may be genuine, the mere fact that she characterizes herself as a journalist does not give her *carte blanche* to batter people

to get a story to post on her YouTube channel, regardless of whether she is paid to do so or receives some other advantage.

¶ 57                                    B. One-Act, One-Crime

¶ 58      Defendant argues that her convictions of battering Knoblauch (count II) and obstructing a peace officer (count IV) violate the one-act, one-crime rule. In making her argument, defendant concedes that she forfeited review of the issue by failing to object at trial and raise the issue in her posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48. Nevertheless, she contends that her forfeiture should be excused and her argument reviewed under the plain error rule.

¶ 59      Under the plain error rule, a court of review may address a forfeited issue when "a clear or obvious error occurred" and either (1) the evidence was so closely balanced that, by itself, it "threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Henderson*, 2017 IL App (3d) 150550, ¶ 38; see *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Defendant contends that her claim is reviewable under the second prong. We agree. See *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009) ("[A] one-act, one-crime violation 'affects the integrity of the judicial process,' thus satisfying the second prong of the plain-error test."). Accordingly, we consider whether defendant's convictions of both battering Knoblauch (count II) and obstructing a peace officer (count IV) violate the one-act, one-crime rule.

¶ 60      In doing so, we observe:

"Analysis under the one-act, one-crime doctrine involves two steps: determining (1) whether the defendant's conduct involved a single act (in which case multiple

convictions are improper) or multiple acts, and, (2) if multiple acts, whether any of the offenses were lesser included offenses (in which case multiple convictions are improper)." *People v. Stanford*, 2011 IL App (2d) 090420, ¶ 33.

Defendant argues that the conduct supporting both convictions was a single physical act. She does not alternatively argue that, if multiple acts were involved, some were lesser included offenses. We disagree that a single physical act underlays both convictions.

¶ 61    When multiple convictions are based on precisely the same physical act, a violation of the one-act, one-crime rule arises. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). In determining whether the rule has been violated, courts first consider "whether a defendant's conduct consisted of separate acts or a single physical act." *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). The definition of an "[a]ct[ ]" is "any overt or outward manifestation which will support a different offense." *People v. King*, 66 Ill. 2d 551, 566 (1977).

¶ 62    If the evidence supports multiple acts, courts consider whether the State charged the defendant with separate acts and presented its case against the defendant that way to the trier of fact. *People v. Crespo*, 203 Ill. 2d 335, 342 (2001). If the State did not charge and present the case on a theory of multiple acts, the reviewing court must vacate the less serious conviction. *People v. Young*, 362 Ill. App. 3d 843, 853 (2005). We review *de novo* whether a defendant's convictions violate the one-act, one-crime rule. *Id.* at 852.

¶ 63    Here, defendant argues that her convictions of counts II and IV were based entirely on the same physical act, *i.e.*, the act of pushing. We disagree. Although defendant committed a battery when she pushed Knoblauch, she also obstructed him, when he was acting as a peace officer, both when she pushed against Knoblauch *and* when she refused to step back from the entrance door after he ordered her to do so. The fact that both counts involved pushing does not mean that both

convictions were based exclusively on the pushing, as count IV charged an additional, separate act that would support a conviction. See *People v. Coats*, 2018 IL 121926, ¶ 15 (noting that a defendant can be guilty of two offenses when an act is part of both offenses or when an act is part of one offense and the only act of the other offense). The obstruction count (count IV) alleged that "defendant[,] after having been given a lawful order to step back from the entryway, refused to obey that order." The battery count (count II) alleged that "defendant made physical contact with and forcibly pushed against the body of *** Knoblauch with her body and hip." The order to step back and refusal to do so supported the obstruction count, while forcibly pushing against Knoblauch's body supported the battery count. Although the obstruction count also alleged that defendant "physically pushed *** Knoblauch in an attempt to forcibly gain entry into the courthouse," this additional verbiage does not, as noted above, alter the obstruction count in such a way that it alleges the same physical act as the battery count. See *id.* Further, the State presented its case on a theory of multiple acts. In its opening statement, the State advised the jury that it would hear evidence that defendant "shove[d] her body in to [*sic*] *** Knoblauch preventing him from closing the door to the courthouse and trying to make her way past him in to [*sic*] this building." It was also readily apparent at trial and in the State's closing argument that the State's case consisted of multiple acts, *i.e.*, that defendant pushed Knoblauch and committed a battery, and she obstructed Knoblauch when she disobeyed his order to step away from the door so that he could close and lock it.

¶ 64                                    III. CONCLUSION

¶ 65    For the reasons stated, we affirm the judgment of the circuit court of La Salle County.

¶ 66    Affirmed.